GREAT WESTERN SAVINGS
BANK, Appellant,

v.

GEORGE W. EASLEY CO.,
J.V. Appellees.

SATORI GROUP, LTD., Michael
Emery, and Steve Matlin,
Cross–Appellants,

v.

GREAT WESTERN SAVINGS BANK,
Cross–Appellee.

Nos. S–2344, S–2345.

Supreme Court of Alaska.

July 28, 1989.

Phillip J. Eide and Michael S. McLaughlin, Guess & Rudd, Anchorage, for Great Western Sav. Bank, appellant/cross-appellee.

Duncan A. Stuart, Bankston, McCollum & Fossey, P.C., Anchorage, for George W. Easley Co., J.V., appellees.

Homer L. Burrell, Anchorage, for Satori Group, Ltd., Michael Emery, and Steve Matlin, cross-appellants.

Before MATTHEWS, C.J., RABINOWITZ, BURKE, and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

## INTRODUCTION

These consolidated appeals arise out of a financially troubled construction project. In *Great Western v. Easley*, an Anchorage jury found the construction lender—Great Western Federal Savings Bank—liable to the general contractor—George W. Easley Company—under several tort and contract theories. It awarded Easley Company $367,000 in compensatory damages and $83,300 in punitive damages. The trial court then subordinated Great Western's deed of trust to Easley Company's mechanics' lien in Easley Company's lien foreclosure action against the developer of the project, Satori Group, Ltd.

In the second case, *Satori v. Great Western*, Great Western filed cross-claims against Satori for foreclosure, indemnity, and contribution. Satori then cross-claimed against Great Western. Satori failed to answer Great Western's cross-claims and the trial court entered a default judgment against Satori. At a later date, the trial court granted Great western's motion for a directed verdict on Satori's cross-claim.

Great Western and Satori appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In May 1984 Satori submitted a $1.8 million construction loan application to Great Western for the development of a retail shopping center named the "Liberty Center." That same month, Great Western approved the application and issued a loan commitment letter to Satori and Satori's sole officers and shareholders, Steve Matlin and Michael Emery.

Satori then entered into a construction contract with Easley Company, a general contractor, on June 11, 1984. Because the Liberty Center plans were unfinished, the parties used a preliminary cost estimate of $1,205,800 as the tentative contract price. The parties agreed that once the architect completed the plans, Easley Company would submit a final cost estimate. If the final cost varied by more than ten percent from the tentative contract price, the contract allowed either party to terminate the agreement.

On June 26, 1984, Great Western closed the $1.8 million construction loan with Satori. In July, Great Western sent its construction budget for the Liberty Center to Satori. This budget allocated specific amounts of loan funds to the project's various components, such as electrical work, roof work, site work, and the like. Great Western informed Satori that it would disburse loan funds up to, but not beyond, the amount budgeted in each category. Great Western further advised Satori that any change orders to the construction contract required Great Western's approval.

By August 1, 1984, the Liberty Center plans were essentially complete. After reviewing the plans and receiving bids, Easley Company submitted a final construction cost estimate of $1,283,736.[1] Satori then

1. The $78,000 difference between the preliminary and final cost estimates resulted primarily from a change in foundation construction. Easley Company's June 11 estimate assumed that the project would be built on a spread-footing foundation. The estimate also provided that if landfill donated by the Municipality of Anchorage for site improvement proved to be frost-

informed Easley Company that it had only $1,035,000 available for "hard construction costs."[2] Subsequently, on August 14, 1984, Easley Company and Satori amended their June 11 contract to provide that Satori, not Easley Company, would be responsible for the foundation and site work. This change brought Easley Company's contract with Satori within the $1,035,000 available for hard construction costs. The parties further agreed that should Easley Company become responsible for the site and foundation work, Easley Company's contract would return to $1,283,736.

On August 15, 1984, George Easley, President of Easley Company, met with Michael O'Brien, the Great Western Loan Officer responsible for the Liberty Center loan, and Matlin, Satori's vice president. Easley told O'Brien that his company was no longer responsible for the site and foundation work and that its contract with Satori totalled $1,035,000. Additionally, Easley asked Great Western to reserve $1,035,000 in construction funds solely for Easley Company and to pay Easley Company directly, instead of going through Satori. O'Brien agreed to both requests in an August 15, 1984 letter.

Construction of the Liberty Center began in September 1984 with Satori's subcontractors performing site and foundation work. On September 21, 1984, Great Western advised Satori that Satori would be solely responsible for site work charges that exceeded Great Western's site and foundation budget of $109,000. By early October, Satori apparently realized that it did not have enough money to pay for the site work. Accordingly, Satori discussed the cost overruns with O'Brien, who advised Satori to request an increase in the loan. On October 16, 1984, Satori wrote a letter to Great Western formally requesting an increase in the loan and outlining the reasons for the increased costs. O'Brien testified that as of October 16, 1984, he knew Satori had insufficient funds to complete the project.

Meanwhile, Satori asked Easley Company to agree to a change order that would include the site work in Easley Company's construction contract. George Easley agreed, and on October 5, 1984, Easley Company and Satori agreed to Change Order No. 1 which increased Easley Company's contract with Satori to $1,283,736. This change order made Easley Company responsible for paying Satori's subcontractors from construction loan funds received from Great Western.

On October 7, 1984, Easley Company submitted Pay Request No. 1 for $252,043, which included $232,144 for foundation and site work performed by Satori's subcontractors. Great Western's consulting engineer, Quadra Engineering, Inc., inspected the project, confirmed that the amount requested by Easley Company fairly reflected the work done, and recommended full payment.

Great Western received and processed Easley Company's first pay request but refused to pay for site work charges beyond the $109,600 budgeted for that work. On October 26, 1984, Great Western issued a check for $155,607[3] and, instead of pay-

free, construction costs could decrease by $240,000. However, by early June it was apparent that the donated landfill was unsuitable for a spread-footing foundation. Consequently, on June 16 the Liberty Center architect changed the project's foundation to a piling foundation. This change largely eliminated the potential savings envisioned by the parties and increased the overall project cost.

2. According to Satori, "soft construction costs are land costs, architectural and engineering fees" as distinct from the costs represented by the Easley Company contract. When the Liberty Center loan closed on June 26, 1984, Great Western's hard cost budget was apparently $1,205,800. On July 6, 1984, a Great Western

commercial loan closer estimated that construction costs were $70,495 over budget. In response, Matlin wrote to the loan officer in charge of the Liberty Center loan at that time, informing her that the Municipality had donated backfill for the site work. He then advised her that pursuant to Easley Company's June 11 preliminary cost estimate, the hard cost budget could be reduced by $240,000. See *supra* note 1. Great Western then reduced the hard cost budget to $1,055,800 on July 12, 1984.

3. In addition to the $109,000 disbursed for site work, Great Western disbursed funds for other budgeted line items, such as electrical work, mechanical work, and contractor profit.

ing it directly to Easley Company, paid the money to Satori.

When Easley Company received $110,000 less than requested, George Easley discussed the shortfall with Satori. George Easley testified, and the trial court found, that Satori assured him that Great Western had approved the change order and that the shortfall would be funded in the second pay request. At this time, Satori's loan increase application was still pending.

On November 8, 1984, Great Western's credit review committee considered and rejected Satori's request to increase the Liberty Center loan by $300,000 to $2.1 million. O'Brien testified that the credit committee required additional security before it would increase the loan. The trial court found that from this day forward the Liberty Center loan was "out of balance."[4]

Meanwhile, work continued on the Liberty Center. In early November Easley Company submitted Pay Request No. 2 for $335,073. This request included money requested, but not received, for site and foundation work in Pay Request No. 1. Quadra inspected the site and approved the second pay request.

Great Western disbursed $335,073 to Satori, which then forwarded the entire amount to Easley Company. By November 26, 1984, Easley Company had received $476,826—the total amount requested in Pay Requests Nos. 1 and 2.

At Satori's request, Great Western disbursed the full amount requested by Easley Company by changing the allocations within Great Western's loan budget to reflect, as completed items, work that Easley Company had not performed. For example, in order to fully fund Easley Company's second pay request, Great Western indicated on its internal budget that it disbursed approximately $59,000 for plumbing and mechanical work when, in fact, Easley Company certified having performed about $12,000 worth of mechanical work. As discussed below, Great Western followed this

policy until the money was exhausted and did not inform Easley of this practice.

The trial court found that Great Western's disbursement practices led Easley Company to believe that Great Western had approved Satori's November 8, 1984 loan request to cover all construction costs. Great Western's expert witness, Chuck Homan, testified that Great Western had not informed Easley of the loan's imbalance because Great Western feared that Easley Company would walk off the job. The trial court found that as of November 8, 1984, Great Western knew that there were insufficient funds available to complete the project and that Easley would go partly unpaid.

On December 10, 1984, Easley Company submitted Pay Request No. 3 for $277,387. Quadra approved the request and forwarded it to Great Western. O'Brien approved the request and disbursed payment to Satori. On December 19, 1984, Easley Company received full payment from Satori. Great Western again disbursed money for items neither completed by Easley Company nor certified by Quadra as having been performed. Consequently, after the third disbursement, Great Western had disbursed 81% of the $1,035,000 available for construction costs. However, the project was only 65% complete.

In early December 1984, George Easley met with the architect and Satori and discussed additional construction changes which culminated in Change Order No. 2. This change increased the total project cost by $48,479.

In January 1985, Easley Company submitted Pay Request No. 4 for $318,417. This request included the adjustments made in Change Order No. 2 and indicated that the total project cost to date was $1,332,215. Later that month Quadra sent the request to Great Western and explained that Change Order No. 2 enhanced the building's features and improved its structural integrity. Quadra therefore con-

---

**4.** A loan is "out of balance" when there are insufficient funds available from all sources, including the borrower, to complete construction of the project. Great Western's banking

expert, Charles Homan, testified that the loan was out of balance as of the first pay request submitted on October 7, 1984.

cluded that Change Order No. 2 "was warranted" and recommended full payment.

Great Western did not disburse any of the money requested in January 1985. George Easley became concerned and contacted Great Western on February 1, 1985. On February 5, 1985, Easley spoke with O'Brien, who assured Easley that full payment was forthcoming as soon as a Temporary Certificate of Occupancy for the Liberty Center was obtained from the Municipality of Anchorage.

Easley Company continued working, and on February 19, 1985, the Municipality issued a Certificate of Occupancy for the Liberty Center. The next day Great Western exhausted the hard construction cost loan amount by disbursing $280,787.51 to Satori. Satori forwarded $200,290.51 to Easley Company and diverted $80,497 for its own use.

On February 21, 1985, Easley Company submitted its final pay request to Satori, Quadra, and Great Western. This request indicated that the total amount earned to date was $1,332,215 and that the remaining amount due on the contract was $377,-711.49. On March 1, 1985, Quadra inspected the Liberty Center, certified the work as complete, and recommended that Easley Company receive full payment.

In late February or early March of 1985, O'Brien informed Easley for the first time that there were no additional funds available in the construction loan for Easley Company. O'Brien told Easley that he had never heard of, nor seen, any of the change orders. The trial court found that O'Brien made this statement with full knowledge of both Change Order No. 1 and Change Order No. 2. In April 1985, George Easley went to Seattle and met with O'Brien to discuss the lack of payment. O'Brien reaffirmed that there was no money available and denied ever increasing the loan to pay Easley Company. Again, O'Brien told Easley that he had never seen nor heard of any change orders on the Liberty Center.

On April 23, 1985, Easley Company filed a Claim of Lien against Satori and, three days later, filed a mechanics' lien foreclosure suit.

In July 1985, Great Western's construction loan interest reserve was depleted, and it refused to enter into a permanent take-out loan commitment with Satori because there were insufficient funds available to satisfy Easley Company's construction lien. Consequently, Great Western scheduled a January 15, 1986 non-judicial foreclosure on the Liberty Center property. Eventually, this foreclosure sale was continued by Great Western and subsequently enjoined by the trial court.

Easley Company filed a complaint against Great Western alleging breach of contract for failure to pay loan funds directly to Easley and for negligent disbursement of the loan proceeds to Satori. Easley Company also asked the superior court for a declaratory judgment subordinating Great Western's deed of trust on the Liberty Center property to Easley's mechanics' lien. Easley Company later amended its complaint to include additional tort and contract theories of recovery and to request an award of punitive damages. This case was then consolidated with Easley Company's lien foreclosure action against Satori.

On September 24, 1986, Satori cross-claimed against Great Western. That same day, Great Western filed a cross-claim against Satori for foreclosure, indemnity and contribution for rent collected. Satori failed to answer Great Western's cross-claims. During trial, Great Western moved for an entry of default against Satori. Satori's counsel was present, did not object to the motion, and it was granted. Great Western then moved for and was granted a directed verdict on Satori's cross-claims. The next day, Satori moved for reconsideration based upon "excusable neglect." The trial court denied Satori's motion.

The trial court submitted Easley's claims against Great Western to a jury using a special verdict. The jury found that Great Western was negligent toward Easley Company and awarded Easley Company $367,711.49. The jury also found that Great Western's August 15, 1984 letter to Easley Company, agreeing to reserve to Easley $1,035,000 and agreeing to pay Eas-

ley directly, was an enforceable promise which Great Western had breached. The jury concluded that Easley Company did not waive its right to direct payment and therefore awarded $80,497 for breach of contract. Finally, the jury found that Great Western was estopped from denying that it approved Change Orders Nos. 1 and 2, and awarded Easley Company $287,-214.49.

The jury found that the total amount of compensatory damages due Easley Company was $367,711.49. The jury also awarded Easley Company $83,300 in punitive damages.

On December 12, 1986, the trial court granted Easley Company the equitable remedy of subordination, thereby placing Easley Company's mechanics' lien ahead of Great Western's first deed of trust.

Before the trial court entered its final judgment, this court issued its opinion in *Donnybrook Building Supply Co. v. Alaska National Bank*, 736 P.2d 1147 (Alaska 1987). Great Western sought reconsideration of the trial court's rulings on the ground that *Donnybrook* precluded all of Easley Company's non-statutory equitable and common law remedies. The trial court denied reconsideration and entered final judgment on July 10, 1987.

Great Western's claims on appeal can be summarized as follows: (1) *Donnybrook* precludes all of Easley Company's causes of action against Great Western; (2) the trial court erred in allowing Easley's breach of contract theory to go to the jury; (3) equitable estoppel was improper; (4) Great Western did not owe Easley a tort duty of good faith and fair dealing;[5] (5) the remedy of equitable subordination was inappropriately granted to Easley; (6) the trial court erred in allowing Easley to claim, as a part of its $367,000 claim for compensatory damages, sums owed to site work and piling contractors and an interior contractor with whom Easley had no direct contractual relationship; and (7) the trial

court erred in allowing Easley's claim of punitive damages to go to the jury.

In its appeal, Satori argues that the trial court erred in entering the default judgment against it and by granting Great Western's motion for a directed verdict.

## II. DISCUSSION

### A. GREAT WESTERN v. EASLEY COMPANY

1. *Are All of Easley's Causes of Action Against Great Western Preempted by the Mechanics' Lien Statutes as a Result of Donnybrook Building Supply Co. v. Alaska National Bank?*

 a. *Introduction*

Alaska's mechanics' lien statute, AS 34.-35.050–.120, provides two remedies for unpaid construction contractors: (1) the stop-payment remedy of AS 34.35.062, and (2) the mechanics' lien under AS 34.35.050.[6] Recently in *Donnybrook* we wrote that this "statutory mechanics' lien scheme ... constitutes a complete remedy that preempts common law and equitable remedies." 736 P.2d at 1148–49. Citing this language, Great Western argues that *Donnybrook* abolished all of Easley Company's theories of recovery. Accordingly, it asks this court to dismiss all of Easley Company's claims.

The trial court found that *Donnybrook* "and its dicta" do not apply to this case. The trial court reasoned (1) that *Donnybrook* involved the "very narrow" issue of the stop-payment notice statute, (2) that unlike *Donnybrook*, Easley Company had a direct contractual relationship with the construction lender and (3) that Easley Company relied to its detriment on representations made by the construction lander. The court also determined that the evidence supported the jury's finding that Great Western engaged in conduct which was

---

5. This argument does not seem to relate to any theory presented to the jury, unless it is subsumed within the general negligence instruction, No. 12, and part IA of the special verdict.

In any case, we find it unnecessary to decide this point as we affirm on independent grounds.

6. A lienor under contract may also pursue his contract remedies under AS 34.35.045.

either malicious or in reckless disregard of Easley Company's rights and interests. Finally, the court held that this court and the legislature did not intend to allow lending institutions to engage in conduct like Great Western's with impunity.

### b. *Donnybrook Building Supply Co. v. Alaska National Bank*

*Donnybrook* involved a dispute between a construction lender and a material supplier under the stop-payment notice statute, AS 34.35.062. *Id.* at 1148. Donnybrook supplied $46,000 worth of building supplies on credit to a contractor for two houses financed by Alaska National Bank of the North. *Id.* Before Donnybrook received payment for these supplies, and before completion of construction, the contractor went bankrupt. *Id.* Donnybrook sued the bank to recover the $46,000 under AS 34.35.062. *Id.* In the alternative, Donnybrook sought an equitable lien against the construction funds and argued that the draw procedure of AS 34.35.062(a)(1)[7] imposed a duty of care upon lenders toward suppliers, for the breach of which a supplier may recover damages. *Id.* at 1148, 1153.

The trial court held that the bank was not liable under the stop-payment notice statute because it did not disburse any construction funds after receipt of the stop-payment notice. *Id.* at 1148. On appeal, we affirmed the trial court's decision that Donnybrook did not have a remedy under the stop-payment notice statute, AS 34.35.-062. *Id.* at 1153. We also rejected Donnybrook's equitable lien and statutory duty theories of recovery. We reasoned:

Alaska's mechanics' lien law ... establishes a complex and detailed scheme for the protection of suppliers on construction projects. The legislature clearly sought to balance the conflicting interests of developers, lenders and suppliers under this statutory umbrella. The stat-

utes provide two separate remedies for suppliers: the stop-payment remedy of AS 34.35.062, and the mechanics' lien under AS 34.35.050. All suppliers have an equal right to the stop-payment notice remedy, but an "individual actually performing labor" (or his trust fund) is entitled to a priority lien. AS 34.35.060(c). While no party to this action asserts a lien under AS 34.35.060(c), we believe that express priority is an indication of legislative intent to provide a complete and prioritized system of remedies. To impose judicially additional remedies on behalf of suppliers here would disturb this balance.

Furthermore, the legislature expressly retained the right of a lienor "under a contract" to utilize his contract theories regardless of his lien. AS 34.35.045. Because only this exception to the exclusivity of the mechanics' lien law remedies is expressed, the statutory maxim *expressio unius est exclusio alterius* suggests that other remedies are excluded. *We conclude that the mechanics' lien law preempts the remedies sought by Donnybrook.*

*Id.* at 1153–54 (emphasis added, citations omitted).

Our holding and analysis are clear when applied to Donnybrook's equitable lien and statutory duty theories. However, at the beginning of the opinion, we stated in introductory, summary language: "the statutory mechanics' lien scheme, of which the stop-payment statute is a part, *constitutes a complete remedy that preempts common law and equitable remedies*." *Id.* at 1148–49 (emphasis added). Moreover, when we introduced our discussion of *Donnybrook's* alternative theories, we added the following footnote:

Suppliers in other states have claimed access to the loan fund under a variety of theories, including the *equitable lien,* constructive trust, negligent disburse-

---

**7.** Alaska Statute 34.35.062(a)(1) provides:

(a) A lender providing construction financing where there is not a payment bond of at least 50 per cent of the amount of construction financing shall observe the following procedures:

(1) Draws against construction financing shall be made only after certification of job progress to the lender by the general contractor, if any, and the owner. The form of certification may be prescribed by the lender.

ment of loan funds and concealment of loan funds. The supplier may also make *contract claims* directly against the lender on the ground that the supplier was a third party beneficiary of the loan agreement, or that the lender guaranteed the developer's debt, or independently promised to pay it. Promissory estoppel might support such a claim. Finally, a supplier could claim *tort* damages for misrepresentation by a lender.

*Id.* at 1153 n. 14 (emphasis added, citations omitted).

Great Western argues that the "entire footnote lists the theories ... which this Court found to be preempted." Great Western also argues that the contract remedy of AS 34.35.045 applies only to construction contracts, not to contracts in which the lender agrees to pay the contractor directly instead of through the developer. Since all of Easley Company's claims fall within footnote 14, and since there was not a construction contract between them, Great Western submits that Easley Company's causes of action are preempted under *Donnybrook*.

We reject this reading of *Donnybrook*. That case held that a supplier may not utilize an equitable lien theory against undisbursed construction funds and that the remedy imposed in the stop-payment notice statute is the exclusive remedy for violations of that statute. The *Donnybrook* opinion did not purport to reject all of the remedies noted in footnote 14. Further, it would be unreasonable to interpret the introductory language quoted above separately from the context of the holding of the case.

As one commentator states:

[S]tatutes precluding actions against a construction lender must be limited to those situations specifically addressed by the particular statute.... For example, if the construction lender perpetrated actual fraud upon the claimant by representing that a claim would be paid without the necessity of serving a stop notice, the lender cannot seek shelter behind [the stop payment notice statute] if the

claimant, in reliance thereon, did not in fact serve the lender with a stop notice.

Gutierrez, *California Civil Code Section 3264 and the Ghost of the Equitable Lien*, 30 Hastings L.J. 493, 516–17 (1979). *See also* Reitz, *Construction Lender's Liability to Contractors, Subcontractors, and Materialmen*, 130 U.Pa.L.Rev. 416, 422 n. 15 (1981) ("Contractors or suppliers may recover in tort actions against construction lenders. If a construction lender has made a material misrepresentation of fact to a contractor ... such as an overstatement of the balance of a loan commitment, and the contractor ... has acted in reliance on that misrepresentation, the elements of an actionable tort may be found.").

In sum, *Donnybrook* does not shield construction lenders from liability for breach of contracts or tortious conduct.

### 2. *Breach of Contract*

The jury concluded that Great Western's August 15, 1984, letter to Easley Company, agreeing to reserve and pay directly to Easley Company $1,035,000, was an enforceable promise which Great Western breached. Accordingly, it awarded Easley $80,497—the amount diverted by Satori from Great Western's fourth pay request disbursement. Great Western makes several arguments that the trial court erred in allowing Easley's breach of contract theory to go to the jury.

First, Great Western asserts that Easley Company's second amended complaint failed to allege consideration and should have been dismissed by the trial court. This argument lacks merit. Alaska is a notice pleading state. Alaska R.Civ.P. 8(a). The rules merely require "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Easley Company's second amended complaint alleged that Great Western had a contractual obligation to make direct payments to Easley Company. It further alleged that Great Western breached this contract and that Easley Company suffered damages. Easley Company's complaint sufficiently put Great

Western on notice of the claims against it and of the grounds upon which they rested. There was no need to allege consideration. The second amended complaint satisfied the requirements of Civil Rule 8(a).

Next, Great Western claims *Donnybrook* preempts Easley Company's contract theory. As previously discussed, assuming a valid contract exists, Great Western cannot use the mechanics' lien statutes to evade a duty imposed by contract.

Finally, Great Western argues that the trial court erred in failing to grant its motions for a directed verdict and judgment notwithstanding the verdict. According to Great Western, Easley Company's contract claim failed for lack of consideration because Easley Company had a pre-existing duty to build the project, and alternatively, if a contract existed, Easley Company waived its rights under the contract.

In reviewing denial of motions for a directed verdict[8] or judgment notwithstanding the verdict, we do not weigh conflicting evidence or judge the credibility of witnesses. Rather, our role is to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment as to the facts. *Mullen v. Christiansen,* 642 P.2d 1345 (Alaska 1982). *See also Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 792 (Alaska 1986). There was sufficient evidence to create a reasonable difference of opinion here.

O'Brien's August 15, 1984, letter to Easley Company provides in pertinent part:

Dear Mr. Easley:

Pursuant to you [sic] contract with the Satori Group, Ltd. for the construction of the Liberty Center ... we agree to reserve construction funds in the amount of $1,035,000 which are committed for the sole purpose and use of the general contractor, George W. Easley Company, and will make all payments up to this amount directly to said general contractor upon appropriate approvals of pay estimates by the owner, architect, and Great Western Federal Savings Bank.

There was evidence that this letter was given in satisfaction of a condition to the modification of the construction contract, which was modified on August 14, 1984. Thus, there was consideration for the promise the letter contained.

Whether Easley Company waived its rights to direct payment is a more difficult question. During the construction of the Liberty Center, Great Western disbursed every pay request to Satori instead of Easley Company. Easley Company did not object to Great Western about this practice, but evidence suggests that George Easley protested to Satori. This conduct could amount to an implied waiver of Easley Company's right to direct payment. However, "[t]o prove an implied waiver of a legal right, there must be direct, *unequivocal* conduct indicating a purpose to abandon or waive the legal right, or acts amounting to an estoppel by the party whose conduct is to be construed as a waiver." *Milne v. Anderson,* 576 P.2d 109, 112 (Alaska 1978) (emphasis added).

George Easley's testimony that he protested to Satori about the bank's disbursements allows, in our opinion, reasonable minds to differ on whether Easley Company waived its right to direct payment. Accordingly, we conclude that the trial court did not err in denying Great Western's motions for directed verdict and judgment notwithstanding the verdict.

### 3. *Equitable Estoppel*

The jury found that Great Western was estopped from denying that it had approved Change Orders Nos. 1 and 2 and awarded Easley Company $287,214.49. Great Western argues that the court erred in allowing the issue of equitable estoppel to go to the jury because the equitable estoppel theory was not pled, except in the

---

8. "[M]otions for directed verdict should be scrutinized under a principle of minimum intrusion into the right to jury trial guaranteed under the Alaska Constitution. Art. I, § 16, Alaska Const.

If there is any doubt, questions of fact should be submitted to the jury." *City of Delta Junction v. Mack Trucks, Inc.,* 670 P.2d 1128, 1130 n. 2 (Alaska 1983).

context of using the theory as grounds to subordinate Great Western's first deed of trust to Easley's mechanics' lien. Further, Great Western contends that the critical element of reasonable reliance on Great Western's alleged misrepresentation that the change orders had been approved was absent from the proof presented.

■ It is noteworthy that appellant does not contend that equitable estoppel will not support a claim for affirmative relief. The general rule is to that effect, *Bubbel v. Wien Air Alaska, Inc.,* 682 P.2d 374, 380 n. 7 (Alaska 1984), although there is contrary authority. *E.g., Oswald v. County of Aiken,* 281 S.C. 298, 315 S.E.2d 146 (App. 1984). Both parties appear to have treated equitable estoppel as equivalent to a misrepresentation theory. Although this may have been error, it was not raised in the trial court and it is not raised on appeal. It is thus not grounds for reversing the judgment in this case.

■ The elements of equitable estoppel are: (1) the assertion of a position by conduct or words, (2) reasonable reliance thereon by an adverse party, and (3) resulting prejudice. *Jamison v. Consolidated Utilities,* 576 P.2d 97, 102 (Alaska 1978). Jury Instruction No. 20 provided:

Easley Joint Venture claims that Great Western should be equitably estopped from denying that it, as to Easley Joint Venture, approved Change Orders Nos. 1 and 2 and modified the construction loan amount reserved for the project. An estoppel may be found where a person by his acts, representations, admissions or noncommunication leads another to believe that certain facts exist, and the other person relies and acts on such belief and will be prejudiced if the former is permitted to deny the existence of such acts.

If you find that it is more likely than not true that these facts exist for Change Order 1 or Change Order 2, you must find for Easley Joint Venture on this issue. Otherwise, you must find in favor of Great Western on this issue.

■ Great Western's contention that estoppel was not adequately pled lacks merit.

Easley Company's amended complaint encompasses each of the elements of estoppel. In paragraph XXIII of the amended complaint Easley Company alleged that: "Great Western changed its loan disbursement pattern in such a way as to lure Easley into thinking that Easley would be paid for the construction of the Liberty Shopping Center." This allegation was incorporated by reference into Counts II and III of the amended complaint, which sought damages. Reliance by Easley is alleged in paragraph XVI of the amended complaint, which refers to the fact that "Easley was looking solely to the construction loan proceeds for payment" in the construction of the project. Resulting prejudice is alleged in the allegation that Easley was not fully paid.

■ Great Western's second objection is that reasonable reliance on the part of Easley on the implied assertion that the change orders had been approved is unsupported by the evidence. Great Western argues that Easley could easily have called Great Western to determine whether the loan had been modified to pay for Change Orders Nos. 1 and 2 and suggests that Easley unreasonably failed to do so, especially when he received $110,000 less than requested on his first pay request.

In our view, whether Easley acted reasonably is plainly a question upon which reasonable minds might differ. Satori told Easley that Great Western had approved the first modification. This seemed to be confirmed within a month when Great Western disbursed a sum sufficient to fully pay Easley's first and second pay requests.

The jury in a special verdict found in favor of Easley in the sum of $80,497 on Easley's theory that Great Western had violated its promise to disburse funds directly to Easley. The balance of the compensatory damages awarded, $287,214.47, were based on the jury's finding that Great Western was estopped from denying approval of Change Orders Nos. 1 and 2. In view of our disposition regarding these two theories, it is not necessary to consider

Great Western's arguments concerning the tort duty of good faith and fair dealing.

### 4. *Compensatory Damages*

 The jury awarded Easley $287,-214.49 for losses incurred by Easley in performing the work called for under Change Orders Nos. 1 and 2. Great Western argues that this amount includes $256,-884.23 in site and foundation costs which Easley was not legally obligated to incur and that the award should be reduced by this amount.

According to Great Western, Easley had no binding contract obligating Easley to pay the following amounts:

| | | |
|---|---|---|
| 1. | Payments to site and foundation sub-contractors—not reimbursed by Great Western | $232,844.00 |
| 2. | Balance due to site and foundation contractors—not paid by Easley; not reimbursed by Great Western | 12,201.16 |
| 3. | Balance due to Miller's Northern Interiors—not paid by Easley; not reimbursed by Great Western | 11,839.07 |
| | Total | $256,884.23 |

Great Western's argument is without merit. Easley accepted responsibility to pay for the site and foundation work at Satori's request.[9] This agreement was reflected in Change Order No. 1, which increased Easley's contract from $1,035,-000 [10] to $1,283,736. Subsequently, Easley and Satori agreed to Change Order No. 2, increasing Easley Company's contract by $48,479 to a total amount of $1,332,215. Change Order No. 2 actually decreased the amount budgeted for Miller's Northern Interiors from $40,905 to $25,000. Clearly, Change Orders Nos. 1 and 2 encompass the work done by the site and foundation sub-contractors and Miller's Northern Interiors. Thus, Easley Company had a legal obligation to pay each of these challenged items.

### 5. *Punitive Damages*

 The jury awarded Easley Company $83,300 in punitive damages. Great Western correctly points out that punitive damages are not normally allowed on a breach of contract claim, unless the conduct would also be a tort. *See Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1286 (Alaska 1985). Great Western argues that there is insufficient evidence of tortious conduct entailing either actual malice or outrageous behavior to justify an award of punitive damages. We disagree. There was evidence that Great Western intentionally misled Easley to believe that it would be fully paid so that Easley would complete the project, thus benefiting Great Western and damaging Easley. Such conduct is tortious.[11] Thus, there was an evidentiary basis for permitting the claim for punitive damages to go to the jury. *See Teamsters Local 959 v. Wells*, 749 P.2d 349, 361 (Alaska 1988) (punitive damage award valid, despite trial court's failure to explicitly instruct jurors that they must find outrageous conduct or reckless indifference, where the evidence supported the award); *Murray v. Feight*, 741 P.2d 1148, 1158 (Alaska 1987) (not plain error for the court to instruct the jury on punitive damages because evidence supported finding that defendant at the very least acted in reckless disregard to plaintiff's rights).

---

**9.** In a letter to O'Brien at Great Western dated October 16, 1984, Matlin notes that:

Satori originally contracted Wilder Construction to do the site work, but we later included this contract under the George Easley Company contract *for the entire project.* Wilder Construction is now a sub-contractor, and that accounts for the addition of site work costs to the Easley budget.

(Emphasis added).

**10.** Change Order No. 1 states that the Liberty Center contract was increased by $77,935 from $1,205,800 to $1,283,736. However the figure of $1,205,800 fails to recognize that the original contract amount was reduced from $1,205,800 to $1,035,800 by a contract modification dated August 14, 1984.

**11.** Restatement (Second) of Torts § 525 (1977) provides:

One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance on the misrepresentation.

### 6. *Equitable Subordination*

■ We have affirmed Easley's money judgment against Great Western. Great Western argues that the court erred in subordinating its deed of trust lien to Easley's mechanics' lien. This argument is, however, mooted by our affirmance of the money judgment against Great Western. Because of the money judgment, the order of subordination can be viewed as an order in aid of collection of the judgment which is within the inherent power of the court.[12] As between Easley and Great Western, the order of subordination is no different than a levy on Great Western's property interest in its deed of trust.

### B. SATORI v. GREAT WESTERN

■ Satori challenges the entry of default on Great Western's cross-claims against it. This challenge is lacking in merit as Satori's counsel did not object to the motion for default, although he was present and was specifically asked by the court if he did object. The default judgment against Satori foreclosed Satori from claiming that Great Western breached its contract with Satori. The trial court thus properly dismissed Satori's cross-claims, which consisted of such allegations, when Great Western moved for a directed verdict. Satori's rejoinder was that the cross-claims were based on the tort of a violation of good faith and fair dealing, not the contract claims. Great Western responded to this by asserting that the obligation of good faith and fair dealing is one sounding in contract, not in tort. The trial court correctly agreed with Great Western's position in this respect. *ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150 (Alaska 1988).

The judgment is AFFIRMED.

---

**12.** "A court of equity has power to entertain an action which has for its purpose the enforcement of a judgment in order that complete justice may be done to the parties in interest as the exigencies of the case or the interests of justice may require." *Shields v. Thomas,* 59 U.S. (18 How.) 253, 262, 15 L.Ed. 368, 372 (1856).