**Larry FLECKENSTEIN and Helen Fleckenstein, Appellants and Cross–Appellees,**

v.

**Tom FACCIO, Appellee and Cross–Appellant.**

**Nos. 4115, 4138.**

Supreme Court of Alaska.

Nov. 21, 1980.

---

Edward L. Garnett, Kenai, for appellants and cross–appellees.

Jeffrey H. Roth, Jensen, Harris & Roth, Anchorage, for appellee and cross–appellant.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.·

## OPINION

MATTHEWS, Justice.

This case involves an alleged oral contract for the sale of land. Mr. and Mrs. Fleckenstein, sellers, appeal from the judgment awarding Tom Faccio 11.104 acres. Faccio cross–appeals from the conclusion of law that there was not sufficient part performance to take the agreement out of the statute of frauds.

We conclude that first, the trial court was correct in finding that Larry Fleckenstein and Tom Faccio formed a contract for the sale of eleven acres;[1] second, the trial

---

1. The court made the following findings of fact:

6. On May 5, 1976 the plaintiff gave to Larry Fleckenstein the sum of $500.00 cash and Larry Fleckenstein gave to plaintiff a receipt for said sum, as earnest money and part payment for the property at issue. The terms of purchase were $2,000.00 per acre, with the acreage consisting of approximately 11 acres (the exact acreage to be determined by survey) and the purchase price to be paid in cash upon completion of the survey. On May 5, 1976 the plaintiff, Nicola Cekin and Larry Fleckenstein walked the boundary of the property which bordered on the Sterling Highway. Larry Fleckenstein told the plaintiff that the property purchased consisted of approximately 11 acres with the exact acreage to be determined by the survey.

7. On or about May 16, 1976 the plaintiff paid an additional $1,000.00 cash as·a part payment and the plaintiff was given a receipt signed by the defendants. Helen Flecken-

court was also correct in its determination that there was a sufficient memorandum of the agreement to remove it from the statute of frauds;[2] and third, Helen Fleckenstein's judicial admission that her husband had authority to sell her property constituted an exception to Alaska's statutory requirement that an agent's authority be in writing where an interest in land is being conveyed.[3]

Because we affirm the trial court's order for specific performance, we do not reach the issue raised by Faccio's cross–appeal.

## I. FACTS

Mrs. Fleckenstein owned a homestead located on the Sterling Highway in Cohoe, Alaska, near Kenai. In May, 1976, while she was out of town, Mr. Fleckenstein and Faccio met to discuss a sale of part of the homestead. During the negotiation, Fleckenstein showed Faccio a map, on which he had pencilled the boundaries of the plot

that he and his wife were to retain,[4] and described the portion for sale. Faccio paid Mr. Fleckenstein $500.00 as earnest money, and Mr. Fleckenstein executed and signed a receipt. The receipt, dated May 5, 1976, described the property as "between Nick Cekin and Larry & Helen Fleckenstein house."[5]

Mr. Fleckenstein telephoned Mrs. Fleckenstein who was out of town at the time of negotiations. She agreed with the transaction her husband proposed. When she returned from Minnesota, she executed a receipt for $1,500.00. This represented the initial $500.00 earnest money paid to Mr. Fleckenstein, plus an additional $1,000.00 Faccio had subsequently paid. The balance of the purchase price was to be paid in cash, after the land was surveyed to determine the exact amount of the acreage. The per acre price was $2,000.00. After the survey and after the purchase price had been paid in full, the deed was to be executed.

stein knew of the sale as negotiated by her husband and ratified the sale.

8. On or after May 5, 1976 Larry Fleckenstein gave his map to the plaintiff and on the map Larry Fleckenstein had drawn the boundaries of a piece of property which the defendants intended to retain, noting thereon the distances of said boundaries, which map depicted the property being sold by the defendants to plaintiff.

2. AS 09.25.010 provides in relevant part:

*Statute of frauds.* (a) In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it is in writing and subscribed by the party charged or by his agent:

. . . . .

(6) an agreement for leasing for a longer period than one year, or for the sale of real property, or of any interest in real property, or to charge or encumber real property;

(7) an agreement concerning real property made by an agent of the party sought to be charged unless the authority of the agent is in writing;

. . . . .

(b) No estate or interest in real property, other than a lease for a term not exceeding one year, nor any trust or power concerning the property may be created, transferred, or declared, otherwise than by operation of law, or by a conveyance or other instrument in writing subscribed by the party, creating,

transferring, or declaring it or by his agent under written authority and executed with the formalities that are required by law . . . [This subsection does not] affect the power of a court to compel specific performance of an agreement in relation to the property.

3. AS 09.25.010(a)(7) and AS 09.25.010(b), quoted in note 2, *supra*, embody the general rule. AS 09.25.020(4) embodies the admissions exception:

*Exceptions to statute of frauds.* A contract, promise, or agreement which is subject to § 10 of this chapter, which does not satisfy the requirements of that section, but which is otherwise valid is enforceable if . . .

(4) the party against whom enforcement is sought admits, voluntarily or involuntarily, in his pleadings or at any other stage of this or any other action or proceeding the making of an agreement;

4. See Appendix A. The "X" mark on the map represents the approximate location of the Fleckensteins' house. The lines drawn around it represent the pencil marks made by Mr. Fleckenstein.

5. Cekin owned a five acre parcel that he had purchased from the Fleckensteins, located in the northeast corner of the original homestead, abutting the Sterling Highway. The Cekin property is designated as Tract A in Appendix A.

Although the survey was delayed, Faccio made payments on the land during the summer.[6] He also cleared part of the northern portion for an airstrip.[7] During the clearing of the airstrip, Faccio discovered gravel. Mrs. Fleckenstein, worried that Faccio would open a gravel pit in competition with hers, told him that he was only buying the northerly five acres on which the airstrip was located. According to Mrs. Fleckenstein, she told Faccio that she wasn't going to sell him "any more land," meaning more than the five acres. According to Faccio, Mrs. Fleckenstein simply said, "[T]he deal is off.... [Y]ou can just have 5 acres, that's all you can have." In response, Faccio tendered a deed and a check for $12,500.00, the remaining balance on the alleged purchase price of $22,000.00 for approximately eleven acres. The Fleckensteins returned the uncashed check, along with the deed.

Faccio filed suit on November 17, 1976, seeking specific performance on an approximately eleven-acre sale.[8] The Fleckensteins disputed the number of acres actually sold in the original transaction, claiming that the sale was for only the five acres of Tract B, adjoining Cekin's property, where the landing strip was cleared. The Fleckensteins and Faccio agreed, however, that the per acre price was $2,000.00 and that the exact dimensions of the parcel were to be determined by survey.

## II. THE CONTRACT

The central issue presented to the trial court in this case was whether the land sale contract between the parties was for the northerly five acres or for those five acres plus six more to the south and east of them. That the Fleckensteins agreed to sell *some* land was never in dispute. After weighing all the evidence, the trial court found that the agreement was to sell all eleven acres. In reviewing the findings by the trial court, our standard is whether they are clearly erroneous.[9] We find that the trial court did not err, and that there was substantial evidence to support its conclusion.

The original receipt issued by Larry Fleckenstein to Faccio refers to the property as being between "Nick Cekin and Larry & Helen Fleckenstein house." An entry in Mr. Fleckenstein's diary similarly described the parcel as "land between Nick and what we keep." Although these descriptions are far from specific, reference to the map given to Faccio by Mr. Fleckenstein discloses that only the disputed six acres lie between the Cekin property and the Fleckenstein home.[10] The five acre plot that the Fleckensteins claim to be the exclusive subject matter of the agreement clearly does not, by itself, fit Mr. Fleckenstein's description.[11]

Testimony of Nicola Cekin and Robert Kilgore, who attended the May meeting between Mr. Fleckenstein and Faccio also indicates that the deal was for approximately eleven acres,[12] and although the

6. There was conflicting testimony about the amount Faccio actually paid. The trial court found that Faccio had made payments totalling $9,500.00; the Fleckensteins testified that Faccio had only paid $8,000.00. Because there was no assignment of error, we need not address the issue.

7. This section is designated as Tract B in Appendix A.

8. Robert Kilgore was originally a plaintiff with Faccio in this suit. He was going to contribute half the purchase price on the property. His claims were dismissed with prejudice.

9. Alaska R.Civ.P. 52(a) provides in part:
   *Findings by the Court*
   (a) *Effect....* Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

10. The section that Faccio claimed to have bought and Fleckensteins denied they sold is designated as Tract C in Appendix A.

11. The section that both parties agreed was sold is designated as Tract B in the Appendix. It is worth noting, however, that unlike the *reproduction in the appendix, the map that Mr.* Fleckenstein gave to Faccio had no line of demarcation separating what we have identified as Tracks B and C. The entire eleven acres appears as an undivided tract.

12. Mr. Cekin testified:

point is disputed, there is further credible testimony to support the trial court's finding that the parties walked the boundary of the property along the Sterling Highway.[13] Again, only the disputed six acres adjoin the highway, the undisputed five acres do not.[14]

## III. STATUTE OF FRAUDS

■ The next issue is whether the trial court was correct in finding that there were sufficient memoranda of the transaction to satisfy the statute of frauds. In general, contracts for the sale of land are unenforceable unless the agreement is in writing or a note or memorandum of it is in writing and signed by the party, or his agent, who seeks to avoid performance.[15] This note or memorandum need not be formal or complete. As Corbin states:

> Q. Did Mr. Fleckenstein say how much or approximately how much land was being sold or being discussed?
> A. That time they didn't know exactly, it should be decided by the surveyor, but they was talking anywhere between 10 and 14 acres.
>
> .    .    .    .    .
>
> Q. Was there any discussion about purchasing the property in this area?
> A. There was discussion of 11 to 14 acre, I don't know exactly how much, but it's going to be on the—behind my tract and about 230 to 260 feet on the main highway. That was discussion.

Mr. Kilgore testified:

> Q. Did you overhear Mr. Faccio and/or Mr. Fleckenstein say anything about the property which was for sale?
> A. Yes. The exact amount wasn't known. The figure that I recall was approximately 11 or 12 acres.
> Q. Who said that?
> A. Mr. Fleckenstein. And the reason the exact amount—through the conversation, to get the exact amount they'd have to get the surveyor from Homer to perform a survey.

Finally, Mr. Faccio testified:

> Q. What did you discuss with Mr. Fleckenstein, in general terms?
> A. What did I discuss? We discussed the balance of the acreage there, which supposedly was between 11 and 12 acres.

13. Mr. Faccio testified:
> THE COURT: Did you actually walk from Mr. Fleckenstein's house along the Sterling Highway on the property line?

[W]e should always be satisfied with "some note or memorandum" that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement.[16]

■ In applying this test to the case before us, we must agree with the trial court's conclusion that the signed receipt issued by Mr. Fleckenstein to Faccio is a sufficient memorandum. The Fleckensteins either admitted at trial, or did not dispute the strong evidence presented by Faccio, that there was oral agreement on every essential term of the contract,[17] except the precise subject matter. There must, of course, be some descriptive identification of the particular tract of land for the contract to be enforceable. The re-

> A. We walked from Tract A, from the park, down right across, to show me what the frontage was here.

Mr. Cekin also testified:

> Q. All right. What did Mr. Fleckenstein say?
> A. He say that he's going to give it on the main Sterling Highway, between 230 and 260 feet.
>
> .    .    .    .    .
>
> Q. All right. And this is the area you walked with Mr. Fleckenstein?
> A. Yes. This here.
>
> .    .    .    .    .
>
> Q. Who else was present?
> A. Bob Kilgore and Tom Faccio.
> Q. While you walked the frontage?
> A. We didn't go the whole way, we walked right here, this part of one driveway, right here.

14. See Appendix A, Tract B.

15. See note 2, *supra.*

16. 2A. Corbin, Corbin on Contracts § 498 at 681 (1950).

17. Mr. Fleckenstein testified:
> Q. What did you sell to Mr. Faccio?
> A. Five acres to make an airstrip along that upper ridge for his plane.
>
> .    .    .    .    .
>
> Q. And how much was Mr. Faccio to pay for that?
> A. He was to pay $2,000.00 an acre cash.

ceipt's reference to "property between Nick Cekin and Larry & Helen Fleckenstein house," in the context of the positions taken by the parties to this case, clearly identifies the property which was sold as all eleven acres rather than the northerly five acres.[18] This element of the statutory requirement is therefore satisfied.[19]

■ As an alternative means of avoiding performance, appellants point to the further requirement of the statute of frauds that an agent's authority to sell land, like the agreement itself, must be evidenced by a writing.[20] The trial court found that Mr. Fleckenstein held himself out as a co–owner of the property,[21] and that Mrs. Fleckenstein ratified her husband's actions.[22] There was substantial evidence introduced at trial to support this finding. There was, however, no written agency agreement between the Fleckensteins.

Counsel for Faccio points to the judicial admission exception to the statute, AS 09.-25.020(4),[23] and raises the possibility that Mrs. Fleckenstein's testimony concerning her business relationship with her husband eliminates the requirement of a written agency agreement. We agree.

Mrs. Fleckenstein testified that Mr. Fleckenstein called her while she was out of town and she assented to the transaction he proposed; that her husband did all the business with her; and that, because they were married for a long time, Mr. Fleckenstein had the right to do whatever he wanted and wait for her signature.[24] Her testimony is

---

**18.** [A] writing may be sufficient even though it is cryptic, abbreviated, and incomplete. A. Corbin, *supra* n. 16, at 683.

Corbin further emphasizes this point, in reference to the adequacy of subject matter identification:

[I]f the court is convinced that no fraudulent substitution of property is being attempted and that the land actually agreed upon has been clearly established by all the evidence, including the written memorandum, the surrounding circumstances, and the oral testimony, little time should be wasted in listening to argument that the written description is inadequate. *Id.* § 505 at 718.

**19.** *See Tzitzon Realty Co., Inc. v. Mustonen,* 352 Mass. 648, 227 N.E.2d 493 (1967); *Kallstrom v. O'Callaghan,* 259 Or. 210, 485 P.2d 1200 (1971).

**20.** *See* note 2, *supra.*

**21.** Title to the Fleckenstein property was in Helen's name. Her ownership predated the marriage. Whether Larry held himself out as a co–owner, or merely as Helen's agent, is unimportant. Even as a co–owner he would have been acting as an agent in his dealings with Faccio.

**22.** The trial court found:

4. Larry Fleckenstein has held himself out to be the owner of the property described in the Complaint, as follows:

(a) orally, to the plaintiff and others

(b) by signing certain plats filed in the Kenai Recording District, namely plats 72–68 and 77–12 whereat he, under oath, certified that he was an owner of the property, the execution of which plats was joined in by Helen Fleckenstein.

(c) Signing the Receipt and Option Contract with Nicola Cekin (purchase of immediately adjacent property from the defendants) wherein he claimed to be owner, the execution of which document was joined in by Helen Fleckenstein.

(d) Signing the Warranty Deed to Nicola Cekin, together with Helen Fleckenstein.

5. Helen Fleckenstein knew that Larry Fleckenstein had and was holding himself out as an owner of the property, consented to said holding out, and did not advise the plaintiff to the contrary, and consented to his so holding out.

. . . . .

7. On or about May 16, 1976 the plaintiff paid an additional $1,000.00 cash as part payment and the plaintiff was given a receipt signed by the defendants. Helen Fleckenstein knew of the sale as negotiated by her husband and ratified the sale.

. . . . .

17. Helen Fleckenstein has ratified her husband's actions orally, in writing and by her course of conduct.

**23.** See note 3, *supra.*

**24.** Mrs. Fleckenstein testified:

Q. From where–did you call your husband, or did your husband call you?

A. He called me.

. . . . .

Q. Okay. And at that time, did you agree with the transaction your husband proposed to you?

A. Yes, I did.

. . . . .

Q. Have you ever told Mr. Faccio that your husband doesn't own any interest in this property?

sufficient to constitute a judicial admission of agency by Mr. Fleckenstein, and to remove that issue from the bar of the statute of frauds.[25]

For the foregoing reasons we find that the court below properly ordered specific performance of the agreement made by the parties. The judgment of the superior court is therefore AFFIRMED.

## APPENDIX A

Tract A:   5 acre Cekin property.

Tract B:   5 acres Fleckensteins claim to have sold.

Tract C:   Disputed parcel, of approximately 6 acres.

X:         Location of Fleckenstein home.

BOOCHEVER, J., not participating.

A. No. He's my husband, he does all the business with me.

. . . . .

Q. So, as far as you're concerned, Mr. Faccio is completely justified in thinking you and your husband owned this together? And you never told him to the contrary?
A. I had no reason to tell anybody anything, as long as . . . .
THE COURT: Just a moment.... Go ahead.
A. He knew it was my homestead, he knew Larry had a homestead.

Q. And they were one and the same?
A. We being married as long as we were, why wouldn't he have the right to do whatever and wait for my signature? That's what he did, he only accepted the down payment in good faith till I returned, and I cannot say the exact day I returned.

25. Because we find that the admission exception was satisfied we need not decide whether the written receipts issued by Mrs. Fleckenstein constituted a ratification and also satisfied the statute as found by the trial court.