John R. WINTHER; and Omega–3, Inc., as successor in interest to Douglas Bart Eaton; all individually and as partners in Prowler Partnership, Appellants,

v.

Gainhart SAMUELSON, Appellee.

No. S–9008.

Supreme Court of Alaska.

Oct. 20, 2000.

David D. Clark, Law Office of David D. Clark, Anchorage, for Appellants.

Charles W. Cohen, Cohen & Associates, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

This case involves a dispute over the proper ownership of federally awarded individual fishing quota ("IFQ") shares. John Winther, Omega–3, Inc., and Gainhart Samuelson filed separate applications for IFQ shares based on their joint ownership of a fishing vessel, the F/V PROWLER. After a full adjudication, the federal agency determined that the parties had owned the vessel as individual tenants-in-common and awarded each party one-third of the F/V PROWLER's IFQ shares. Winther and Omega–3 brought suit in state court, claiming that, under state law, the parties had owned the boat as a partnership and that Samuelson had sold his future fishing rights to them when he sold his partnership interest in 1989.

The superior court granted summary judgment to Samuelson, ruling that Samuelson could not have sold his future fishing rights as part of his partnership because the federal adjudication had already determined that the rights never vested in the partnership. The court further found that the statute of frauds would bar enforcement of any alleged contract for future fishing rights when those rights were not identified in the contract itself. Because we agree that the federal adjudication and the statute of frauds resolve all outstanding issues of material fact, we affirm.

### II. FACTS AND PROCEDURAL HISTORY

#### A. The Purchase and Sale of F/V PROWLER

In 1985 John R. Winther, Douglas Bart Eaton,[1] and Gainhart "Bud" Samuelson pur-chased the F/V PROWLER, a freezer vessel. They registered the title with the United States Coast Guard, listing Samuelson, Eaton, and Winther as equal individual owners. They also entered into a co-ownership agreement to formalize the purchase. Under the agreement, they owned the F/V PROWLER as tenants-in-common, each owning one-third interest in the vessel. The agreement explicitly stated that the parties did not own the vessel in partnership:

> 3. *No Partnership Intended.* In no event shall the Vessel be considered to be owned or operated by a partnership composed of the parties and each party acknowledges that he is an independent contractor and not a partner or joint venturer with respect to the Vessel or to the management or operation thereof. . . .

Despite this provision, there is evidence that the parties believed that they owned and operated the boat as part of a partnership called the Prowler Partnership.

From 1985 through 1989, the F/V PROWLER made legal landings of sablefish off the coast of Alaska. In 1989 Samuelson sold his ownership interest in the F/V PROWLER pursuant to an "Agreement for Sale of Ownership Interest." Winther and Eaton agreed to buy Samuelson's one-third interest in the vessel and the parties agreed to terminate the "joint venture partnership that operates the F/V PROWLER."

In 1990 the parties entered into a release agreement whereby they agreed that Samuelson would be paid in full by February 1990 for any monies due and owing pursuant to the sale agreement. The release also stated that

> [t]his agreement to receive payment and release of any and all claims is a final settlement between the parties of any partnership claims known or unknown and this settlement is a final settlement from which no claims of any manner known or unknown now or in the future may be brought.

---

1. In 1986 Eaton transferred his ⅓ interest in the F/V PROWLER to Omega–3, Inc., a closely held corporation that he and his wife owned.

## B. The Federal Individual Fishing Quota Program

In 1976 the federal government enacted the Magnuson Fishery Conservation and Management Act for the purpose of conserving and managing the fishery resources found off the coasts of the United States.[2]

In 1993, pursuant to this Act, the United States Secretary of Commerce promulgated regulations to limit access to sablefish and halibut fisheries in the Gulf of Alaska and the Bering Sea.[3] The regulations replaced the previously open system of fishing with a quota share program administered by the National Marine Fisheries Service ("NMFS").[4]

Under the new system, NMFS determines initial allocations of quota shares to "qualified persons."[5] These initial quota shares are then used each year to determine the annual individual fishing quota for each qualified person.[6] To qualify for an initial allocation of quota shares, an applicant must have owned or leased a vessel that made legal landings of halibut or sablefish during 1988, 1989, or 1990.[7] An applicant can be an individual, corporation, partnership, association, or other entity.[8] Former partners of now dissolved partnerships are also eligible.[9] Once the applicant qualifies, the actual amount of quota shares awarded depends on the highest landing the vessel achieved during 1984 through 1989.[10]

The regulations specify the documents that NMFS should consider in determining whether an applicant owned or leased a qualifying vessel.[11] Evidence of ownership is limited to (1) a United States Coast Guard ("USCG") Abstract of Title, (2) a certificate of registration that is determinative as to vessel ownership, or (3) a bill of sale.[12]

## C. The Federal Adjudications

In 1994 Samuelson and Winther filed competing claims for the IFQ shares associated with the F/V PROWLER. Both Samuelson and Winther agreed that the Prowler Partnership owned the vessel during the qualifying years. However, Samuelson claimed that the partnership had dissolved in 1989 when he sold his co-ownership interest, and that he was therefore entitled to one-third of the F/V PROWLER shares based on his status as a former partner of a now dissolved partnership. Winther claimed, in contrast, that the Prowler Partnership still existed and that Samuelson had sold his future fishing rights when he sold his partnership interest. Winther argued that Winther and Omega–3, as the remaining partners of the Prowler Partnership, were entitled to one hundred percent of the F/V PROWLER IFQ shares.

The competing claims were resolved by a NMFS Initial Administrative Determination which determined that the parties had owned the vessel as individuals and that Samuelson was therefore entitled to one-third of the IFQ shares. NMFS rejected both parties' contention that the partnership had owned the vessel, stating that "[i]f anything on this record is clear, it is that no entity called the 'Prowler Partnership' ever held any ownership interest whatsoever, in the vessel known as the F/V PROWLER." NMFS noted that both the USCG title and the parties' own co-ownership agreement established that the parties owned the vessel as individuals, not in partnership.

The Prowler Partnership appealed. On appeal, NMFS, Office of Administrative Appeals, issued a new decision, affirming the Initial Administrative Determination. The decision on appeal reiterated that the best

---

2. 16 U.S.C. §§ 1801–1883 (1994 & Supp. IV 1998).

3. See 50 C.F.R. §§ 679.1–679.50 (1999).

4. See Ferguson v. Ferguson, 928 P.2d 597, 598 (Alaska 1996) (describing the IFQ program).

5. 50 C.F.R. § 679.40(a).

6. See id. § 679.40(c).

7. See id. § 679.40(a).

8. See id. §§ 679.2, 679.40(a)(2)(i).

9. See id. § 679.40(a)(2)(iii) ("A former partner of a dissolved partnership or a former shareholder of a dissolved corporation who would otherwise qualify as a person may apply for [quota share] in proportion to his or her interest in the dissolved partnership or corporation.").

10. See id. § 679.40(a)(4).

11. See id. § 679.40(a)(3)(ii)-(iii).

12. See id. § 679.40(a)(3)(ii).

evidence of ownership was the USCG title. Because the title listed the owners as individuals, the shares belonged to the owners as individuals, not as partners in the partnership. NMFS declined to decide "whether the release creates any contractual rights that [the partnership] can seek to enforce in another forum."

The Prowler Partnership moved for reconsideration, raising for the first time the argument that the Prowler Partnership had leased the F/V PROWLER. NMFS found this argument untimely and reaffirmed the original decision. On March 14, 1996, the NMFS Decision on Reconsideration was affirmed by the regional director and became the final agency action.

The Prowler Partnership appealed the agency action to the United States District Court for the District of Alaska.[13] The federal court held that the agency's finding of individual ownership was within its discretion.[14] However, the court remanded the case back to the agency for consideration of the lessee argument.[15]

### D. State Court Proceedings

Shortly after the NMFS decision became the final agency action, Winther, Omega–3, and the Prowler Partnership (hereinafter "Winther") filed suit against Samuelson in state court. The complaint alleged that the Prowler Partnership had owned the F/V PROWLER and that Samuelson had sold his future fishing rights when he sold his partnership interest. It requested either the transfer of Samuelson's IFQ shares to the partnership or an award of damages commensurate with their value.[16]

Samuelson moved for summary judgment, claiming that the NMFS action had resolved all these issues. The superior court agreed, concluding that,

[i]n this case, NMFS allocated IFQ shares to Samuelson based on his *individual* ownership in the Prowler, not on a *partnership interest*. This allocation has been upheld by a federal court. Therefore, pursuant to federal law, *no* fishing rights ever vested in the Prowler Partnership. Consequently, even if this court determines that the Prowler Partnership owned the F/V Prowler and that Samuelson sold his partnership interest, it cannot find that Samuelson's partnership interest included future fishing rights—the vesting of such rights is solely within the jurisdiction of the federal government. (Footnotes omitted; emphasis in original.)

The court further noted that, insofar as a private agreement may have existed whereby Samuelson agreed to transfer his future fishing rights to the partnership, such an agreement would be unenforceable because of the statute of frauds.

Winther now appeals to this court.

### III. STANDARD OF REVIEW

■■■ We review a grant of summary judgment de novo, affirming the superior court's decision if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[17] In reviewing the motion for summary judgment, we draw all reasonable inferences of fact in favor of the nonmoving party.[18]

### IV. DISCUSSION

A. Samuelson Did Not Sell His Future Fishing Rights as Part of His Partnership Interest Because the Fishing Rights Never Vested in the Partnership.

■■■ Winther's claim to Samuelson's shares rests primarily on his theory that

---

**13.** See Prowler Partnership v. National Marine Fisheries Serv., Case No. A96–126–CV, Slip Op. at 9 (D.Alaska Dec. 9, 1997). Samuelson is not a party to the federal district court action. Winther and NMFS stipulated that if the Prowler Partnership is awarded one hundred percent of the IFQ shares for the F/V PROWLER, Samuelson will retain the shares already awarded to him.

**14.** See id. at 9.

**15.** See id.

**16.** Winther has abandoned the claim for specific performance on appeal.

**17.** See Ganz v. Alaska Airlines, Inc., 963 P.2d 1015, 1017 (Alaska 1998).

**18.** See Brady v. State, 965 P.2d 1, 8 (Alaska 1998).

Samuelson sold his future fishing rights as part of his partnership interest in 1989. But Winther fails to acknowledge that he has already litigated—and lost—this issue. For Samuelson to sell his future fishing rights as part of his partnership interest, the fishing rights must have been part of his partnership interest. Yet NMFS awarded Samuelson his IFQ shares based on his *individual* ownership of the vessel, not based on his partnership interest. Therefore, pursuant to federal law, *no* fishing rights were owned by the partnership. Samuelson could not have sold his future fishing rights as part of his partnership interest because those rights belong to him as an individual, not as partner in the Prowler Partnership.[19]

Winther attempts to obscure the repetitive nature of this litigation by claiming that the federal adjudication never determined whether the Prowler Partnership owned the F/V PROWLER under state partnership law. This is true but wholly irrelevant. Regardless of whether the Prowler Partnership owned the vessel pursuant to state partnership law, the fact remains that, *for purposes of IFQ allocation,* the federal government has already determined that the parties owned the vessel as individuals. Thus, the fact that the Prowler Partnership may, in one sense, have "owned" the vessel pursuant to state law does not change the fact that pursuant to federal law the IFQ shares belong to the individual owners.

Winther argues that the prior federal adjudication should not prevent him from claiming that the partnership is the true owner of the IFQ shares. He points out that if he had litigated the issue of ownership in state court *prior* to the federal litigation, he might have been able to change the USCG title to reflect the partnership's ownership, hence altering the outcome of the federal adjudication. But this argument is not only speculative, it is irrelevant. Regardless of what action Win-

ther could have taken *prior* to the federal litigation, the fact remains that NMFS has issued its decision and the ownership of the vessel for purposes of IFQ allocation has already been determined.

Winther attempts to analogize this case to our prior cases that involved allocation of IFQ shares in the context of divorce.[20] In these cases we held that IFQ shares should be considered marital property to the extent that the IFQ entitlement was earned during the marriage.[21] Winther argues that, similarly, in the present case the IFQ shares should be considered partnership property because they were earned through the expenditure of partnership assets and effort. But Winther's analogy between partnership law and divorce law is inexact. The designation of particular property as "marital" says nothing about who owns the property. Rather, "marital property" may be "joint or separate."[22] The term merely describes whether property must be taken into account in a divorce property division. By contrast, partnership property is a type of ownership.[23] Thus while there is no conflict between NMFS awarding IFQ shares to an individual and a state court designating them marital property for divorce property division purposes, there is a conflict between NMFS awarding IFQ shares to an individual on the basis of his individual ownership and a state court determining that the IFQ shares actually belonged to a partnership.

Winther's claim to Samuelson's IFQ shares as part of the partnership interest that Samuelson sold in 1989 fails as a matter of law for one simple reason: The federal adjudication has already determined that Samuelson's IFQ shares belong to Samuelson as an individual, not as a partner in the Prowler Partnership. Whatever else Samuelson may have sold as part of his partnership interest in 1989, he cannot have sold his IFQ shares

**19.** *Cf. State, Child Support Enforcement Div. v. Bromley,* 987 P.2d 183, 192 (Alaska 1999) ("The ... doctrine of collateral estoppel (issue preclusion) prevents relitigation of an issue already litigated and decided....").

**20.** *See, e.g., McGee v. McGee,* 974 P.2d 983 (Alaska 1999); *Johns v. Johns,* 945 P.2d 1222 (Alaska 1997).

**21.** *See McGee,* 974 P.2d at 988; *Johns,* 945 P.2d at 1226.

**22.** AS 25.24.160(a)(4).

**23.** *See* AS 32.05.030(a).

because those shares never accrued to the partnership interest in the first place.

B. *The Statute of Frauds Bars Any Possible Contract Between Samuelson, Winther, and Eaton for Samuelson's Individual IFQ Shares.*

Although Samuelson could not have sold his IFQ shares as part of his partnership interest, it is still possible that he agreed to sell his individual shares as part of a separate transaction with the remaining partners of the Prowler Partnership. Significantly, Winther did not argue to the superior court below that the parties had entered into such an agreement.

However, on appeal, Winther implies that the parties actually entered into such an agreement and that Samuelson fully understood that he was selling his future fishing rights in addition to his partnership assets and ownership interest. But, as the superior court recognized, even ·if the parties had entered into such an agreement, the statute of frauds bars any enforcement of that contract.

Alaska Statute 45.01.206 provides, in relevant part,

a contract for the sale of personal property is not enforceable by action or defense beyond $5,000 in amount or value of remedy unless there is a writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by an authorized agent.

The IFQ shares are worth over $5,000. Therefore, the contract must "reasonably identify," in writing, the future fishing rights in order to be enforceable. But the only subject matter identified in the sale agreement is Samuelson's "one-third (33.33%) co-ownership interest in the F/V PROWLER."

The agreement says nothing about "future fishing rights."

■ Winther argues that the statute of frauds is nevertheless inapplicable to his case because he has fully performed his part of the contract. Alaska recognizes an exception to the statute of frauds if "there has been full performance on one side accepted by the other in accordance with the contract."[24] But Winther's alleged "full performance"—payment of the full sale price of the vessel—does not qualify under this exception because its meaning is unclear. There is nothing about Winther's delivery of the full sale price that suggests that the sale price was intended to pay for both the vessel *and* Samuelson's future fishing rights. Indeed, the sale agreement mentions only the "value of F/V PROWLER." Therefore, Winther's delivery of the sale price contributes nothing to a further understanding of the parties' contract and is not sufficient to remove the contract from the statute of frauds.

Winther alternatively argues that there is sufficient writing in the contract to satisfy the statute of frauds and "extrinsic evidence" should be used to "flesh out" the subject matter of the sale. In *Fleckenstein v. Faccio*,[25] we recognized the possibility that extrinsic evidence could be used to flesh out a defective description of land.[26] In *Fleckenstein* the sellers contended that only five acres had been sold, while the buyer contended that eleven acres had been sold.[27] There was a memorandum of agreement which was consistent with the buyer's contention and inconsistent with the sellers'.[28] Given these limited choices we held that the writing was sufficient to satisfy the statute of frauds.[29] But we cautioned that "[t]here must, of course, be some descriptive identification of the particular tract of land for the contract to be enforceable."[30] This case does not resemble *Fleckenstein.* Here the writings do not contain any reference to future fishing rights nor do they refute in any

24. AS 09.25.020(1).

25. 619 P.2d 1016 (Alaska 1980).

26. *See id.* at 1017.

27. *See id.* at 1019.

28. *See id.* at 1020–21.

29. *See id.* at 1021.

30. *Id.* at 1020.

way Samuelson's position that no fishing rights were sold. The "fleshing out" of the contract for future fishing rights that Winther claims exists goes well beyond what the law allows.

## V. *CONCLUSION*

Winther asserts two possible theories to support his claim to Samuelson's IFQ shares: (1) that Samuelson indirectly sold his future fishing rights as part of his partnership interest; or (2) that Samuelson knowingly sold his individual interest in his future fishing rights at the same time as he sold his co-ownership and partnership interests. The first claim fails as a matter of law because the federal adjudication has already determined that no fishing rights accrued to the partnership and therefore could not be sold as part of the partnership assets. The second claim also fails as a matter of law because the statute of frauds bars enforcement of any alleged contract for Samuelson's future fishing rights.

Therefore, because Samuelson is entitled to judgment as a matter of law on his motion for summary judgment, we AFFIRM the superior court's order granting the motion.

CARPENETI, Justice, not participating.