VALDEZ FISHERIES DEVELOPMENT ASSOCIATION, INC., Appellant/Cross–Appellee,

v.

ALYESKA PIPELINE SERVICE COMPANY, Appellee/Cross–Appellant.

Sea Hawk Seafoods, Inc., Appellant/Cross–Appellee,

v.

Alyeska Pipeline Service Company, Appellee/Cross–Appellant.

Nos. S–8280, S–8549.

Supreme Court of Alaska.

April 19, 2002.

Rebecca S. Copeland, Koval & Featherly, P.C., Anchorage, for Appellant/Cross–Appellee Valdez Fisheries Development Association, Inc.

Michael T. Schein, Maltman Reed North Ahrens & Malnati, John G. Young, Young deNormandie & Oscarsson, and Kevin P. Sullivan, Sullivan & Thoreson, Seattle, Washington for Appellant/Cross–Appellee Sea Hawk Seafoods, Inc.

James E. Torgerson and Andrew F. Behrend, Heller Ehrman White & McAuliffe LLP, Anchorage, for Appellee/Cross–Appellant Alyeska Pipeline Service Company.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

We address here claims arising from a letter sent and statements made by Alyeska Pipeline Service Company during negotiations for a proposed three-way transaction involving Alyeska, Sea Hawk Seafoods, Inc., and Valdez Fisheries Development Association, Inc. Because Valdez Fisheries' complaint against Alyeska did not state a claim on which relief could be granted, we hold that it was not error to dismiss Valdez Fisheries' claims. And because there are no genuine issues of material fact, we hold that it was not error to dismiss Sea Hawk's claims on summary judgment. We therefore affirm in all respects.

## II. FACTS AND PROCEEDINGS

In December 1993 James McHale, an Alyeska Pipeline Service Company manager, made a presentation to the Valdez City Council asking the city to provide a wildlife rehabilitation center for Alyeska's use in event of an oil spill.[1] In a later city council meeting, Alyeska faced strong opposition from the business community, which wanted Alyeska to obtain the center from the private sector rather than the city. Raymond Cesarini, president of Sea Hawk Seafoods, then suggested to McHale that Alyeska buy Sea Hawk's plant for use as a rehabilitation center. McHale said that Alyeska "was already thinking favorably of using" Valdez Fisheries Development Association "for the project"

---

1. We describe the facts for purposes of these appeals taking all permissible inferences in favor of Valdez Fisheries and Sea Hawk Seafoods.

and suggested that Sea Hawk contact Valdez Fisheries.

Cesarini then offered to sell Sea Hawk's plant to Valdez Fisheries so Valdez Fisheries could use the plant in its proposal to Alyeska. In January 1994 Cesarini again spoke with Alyeska's McHale. McHale again "stated that Alyeska was thinking favorably of using [Valdez Fisheries] for the project" and suggested that Cesarini speak with Valdez Fisheries about a " 'win, win' arrangement whereby Sea Hawk would sell its processing plant to [Valdez Fisheries] and [Valdez Fisheries] in turn would lease the plant to Alyeska." McHale described the arrangement as mutually beneficial because it would allow Alyeska to meet its environmental obligations, Sea Hawk to absolve itself of existing liabilities, and Valdez Fisheries to have a source of income to help support its fish hatchery operations.

Cesarini met with McHale for a third time in mid-January 1994 and expressed concern about selling the plant to Valdez Fisheries rather than directly to Alyeska because of Valdez Fisheries' financial problems. Cesarini declared that McHale "confirmed that [Valdez Fisheries] would get the Alyeska contract, utilizing the Sea Hawk plant." Cesarini later declared that McHale "also promised me that, if for any reason Alyeska did not lease the Sea Hawk plant from [Valdez Fisheries], . . . Alyeska would lease the Sea Hawk plant directly from Sea Hawk on the same terms and conditions."

In January 1994 Alyeska sent many companies, including Valdez Fisheries, a letter soliciting proposals for the wildlife rehabilitation center. Soon thereafter Valdez Fisheries and Sea Hawk signed an agreement for the sale of the Sea Hawk facility to Valdez Fisheries for $2.5 million, contingent upon Alyeska awarding the wildlife rehabilitation center contract to Valdez Fisheries. The Sea Hawk–Valdez Fisheries sales agreement was not to become "effective" until Valdez Fisheries gave Sea Hawk written notice that Alyeska had approved Valdez Fisheries' proposal to lease the property to Alyeska as a wildlife rehabilitation center. The contract permitted Sea Hawk to revoke the agreement before the effective date upon five-days notice. After the effective date, Sea Hawk would no longer be able to revoke the agreement, but the purchase price would increase $500 per day until closing.

Valdez Fisheries submitted a wildlife rehabilitation center proposal to Alyeska on January 25, 1994. In April 1994 Alyeska informed all bid applicants, including Valdez Fisheries, that it was "unable to select a contractor from the proposals received"; it invited bidders to "reconsider the cost proposed and if [their] review result[ed] in a cost reduction, [to] please submit a revised cost proposal." Valdez Fisheries then submitted a revised proposal, offering three alternative leases, a five-year lease at $43,000 per month, a seven-year lease at $40,000 per month, or a ten-year lease at $35,000 per month.[2]

By letter of May 6, 1994 Alyeska responded to Valdez Fisheries' "bid submittals" stating:

> We have completed our review of the revised proposals received in response to our invitation TAPS/5890 for A150 Wildlife Rehabilitation Center.
>
> This is to inform you that based on a thorough evaluation of all factors, you have been selected as the winning bidder. Your proposal was deemed to best meet our requirements for this facility.
>
> *We intend to begin the process of negotiating a contract as soon as possible. For your planning purposes, we would like to begin discussions the week of May 16, 1994.* You will be contacted by telephone to schedule the place and time to meet.
>
> We look forward to a successful association between our two companies. This facility will be a welcome addition to our oil spill contingency program.[3]

(Emphasis added.)

Valdez Fisheries faxed a copy of Alyeska's letter to Sea Hawk; Valdez Fisheries and Sea Hawk thereafter acted as if the effective

---

2. This is how Valdez Fisheries' third-party complaint described its offer.

3. This is how Valdez Fisheries' third-party complaint described Alyeska's response.

date of their contract for sale had been triggered.

In June 1994 Alyeska and Valdez Fisheries began meeting to negotiate the contract. Valdez Fisheries prepared a draft of the lease agreement and sent it to Alyeska to serve as a framework for the meetings to follow. But at a July 7, 1994 meeting, Alyeska advised Valdez Fisheries that it was reanalyzing the costs of the wildlife rehabilitation center and declined to discuss further the finalization of the lease agreement. At this meeting, Alyeska also asked Valdez Fisheries about "the status of [the] negotiations" with Sea Hawk.

In a July 29, 1994 letter, Alyeska advised Valdez Fisheries not to expend funds on developing the center until Alyeska notified it to proceed. The letter also included a revised program and facility space requirements. On August 8, 1994 Alyeska sent Valdez Fisheries a letter stating that Alyeska had "chosen to pursue other avenues to accomplish our objective" and that "further negotiations are unnecessary."

Sea Hawk sued Valdez Fisheries alleging breach of contract and promissory estoppel. Valdez Fisheries answered and filed a third-party complaint against Alyeska, claiming, among other things, breach of contract and promissory estoppel. Sea Hawk then asserted direct claims against Alyeska. Superior Court Judge John Reese ultimately dismissed all of Valdez Fisheries' claims against Alyeska under Alaska Civil Rule 12(b)(6), and granted summary judgment to Alyeska on Sea Hawk's claims. The case between Valdez Fisheries and Sea Hawk went to trial, and the jury returned a large verdict for Sea Hawk. Sea Hawk and Valdez Fisheries have since settled their disputes, leaving the Sea Hawk–Alyeska disputes and the Valdez Fisheries–Alyeska disputes.

Valdez Fisheries appeals the Rule 12(b)(6) dismissal of its contract and promissory estoppel claims against Alyeska, the denial of leave to amend the third-party complaint to assert newly discovered claims, the refusal to sanction Alyeska for improper discovery conduct, and the limitation of Valdez Fisheries' damages to its out-of-pocket costs in negotiating with Alyeska. Sea Hawk appeals the summary judgment dismissing its claims of promissory estoppel, negligent misrepresentation and omission, third-party beneficiary, and breach of duty to negotiate in good faith. Alyeska appeals the superior court's denial of Alyeska's request for an enhanced attorney's fees award.

## III. DISCUSSION

### A. Standard of Review

■■■ We review the dismissal of Valdez Fisheries' claims for failure to state a claim de novo.[4] We "only consider the material contained in the pleadings" of Valdez Fisheries,[5] construing the third-party complaint against Alyeska in the light most favorable to Valdez Fisheries, and presume the pleading's allegations to be true.[6] We will affirm the dismissal of Valdez Fisheries' third-party complaint for failure to state a claim only if "it appears beyond doubt" that Valdez Fisheries can prove no set of facts which would entitle them to relief.[7]

■■■ We review the dismissal of Sea Hawk's claim on summary judgment de novo.[8] A summary judgment movant must establish that there "are no genuine issues of material fact and that it is entitled to judgment as a matter of law."[9] We draw all reasonable inferences in favor of Sea Hawk—the nonmoving party.[10]

4. *Christiansen v. Melinda*, 857 P.2d 345, 346 n. 2 (Alaska 1993) (citing *Kollodge v. State*, 757 P.2d 1024, 1026 n. 4 (Alaska 1988)).

5. *Kollodge*, 757 P.2d at 1026 (citation omitted).

6. *Id.* (citation omitted).

7. *Shooshanian v. Wagner*, 672 P.2d 455, 461 (Alaska 1983) (citation omitted).

8. *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1134 (Alaska 1996).

9. *Id.* (citing *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985)).

10. *Reeves*, 926 P.2d at 1134 (citations omitted).

**B. It Was Not Error To Dismiss Valdez Fisheries' Contract Claim Under Civil Rule 12(b)(6).**

The superior court granted Alyeska's Civil Rule 12(b)(6) motion and dismissed Valdez Fisheries' contract claim, holding that no contract was formed. Valdez Fisheries argues that this was error because its third-party complaint against Alyeska alleged an agreement with terms that are sufficiently definite and certain for contract formation.

 Rule 12(b)(6) dismissal is appropriate where the complaint, given the benefit of all reasonable inferences, "presents no set of facts justifying recovery." [11] A valid contract requires "unequivocal acceptance by the offeree." [12] We therefore look to see whether Valdez Fisheries' third-party complaint directly or inferentially contains any factual allegations which could be considered an unequivocal expression of acceptance.

 The pertinent allegations are found in the text of Alyeska's May 6, 1994 "winning bid" letter, set out verbatim in the third-party complaint. [13] The letter's second paragraph contains the language most strongly supporting Valdez Fisheries' contract claim. It states, "you have been selected as the winning bidder." But this language does not unequivocally express acceptance because it is susceptible to at least two alternative interpretations. These words could mean either "we accept your bid as written," or "we have chosen you as the contractor with whom we will negotiate." The remainder of the letter fully resolves this ambiguity. The letter's next paragraph, also set out in the third-party complaint, states that "[w]e intend to begin the process of negotiating a contract as soon as possible." This passage requires a conclusion that Alyeska was not communicating an unequivocal acceptance of a Valdez Fisheries' offer.

 Moreover, Valdez Fisheries' proposal contained three alternative lease proposals that differed significantly with respect to the duration and monthly rent for any lease. Even if we were to interpret Alyeska's letter to say unequivocally that "we accept your offer," we could not say which of the three offers it was accepting, and whether Alyeska was agreeing to lease the property for five years, seven years, or ten years, with monthly rent payments of $43,000, $40,000, or $35,000, respectively. Duration and price are important contract terms. [14] Such great

---

11. *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47 (1st Cir.1999) (citation omitted); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988) (interpreting Federal Rule of Civil Procedure 12(b)(6) and stating that "[m]odern notions of 'notice pleading' notwithstanding, a plaintiff ... is nonetheless required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory"); Charles Alan Wright et al, Federal Practice and Procedure § 1216, 156–59 (2d ed.1990) (stating complaint must "contain allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial"); *see also Blaw Knox Ret. Income Plan v. White Consol. Indus., Inc.*, 998 F.2d 1185, 1189–90 (3d Cir.1993) (affirming Federal Rule of Civil Procedure 12(b)(6) dismissal because ERISA complaint that employer breached fiduciary duty did not specifically allege facts which, if true, would demonstrate that employer had mismanaged plans or failed to meet statutory funding obligations); *Dworkin v. First Nat'l Bank of Fairbanks*, 444 P.2d 777, 779–80 (Alaska 1968) (holding that Alaska Civil Rule 12(b)(6) dismissal was proper where complaint afforded no factual basis for inferring requisite elements of equitable mortgage claim).

12. *Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997) ("The formation of a valid contract requires an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound.") (citations omitted).

13. *See Ahwinona v. State*, 922 P.2d 884, 886 (Alaska 1996) (interpreting meaning of attached release in affirming Rule 12(b)(6) dismissal). Interpreting the words in a contract is a question of law "[w]here the facts relating to surrounding circumstances are not in dispute." *State v. Fairbanks N. Star Borough Sch. Dist.*, 621 P.2d 1329, 1331–32 n. 5 (Alaska 1981) (quoting *Nat'l Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 586 (Alaska 1976)).

14. *See Magill v. Nelbro Packing Co.*, 43 P.3d 140, 143–44, (Alaska 2001) (affirming trial court's conclusion that no profit sharing agreement had been formed where no evidence of sufficiently definite price term); *Clark v. Greater Anchorage, Inc.*, 780 P.2d 1031, 1035 (Alaska 1989) (affirming denial of directed verdict where agreement to procure insurance was sufficiently definite and certain because, among other things, duration of coverage could be inferred from past dealings and business customs).

differences in important contract terms preclude finding a meeting of minds.[15] The significant differences in the alternatives confirm that the May 6 letter was not an unequivocal acceptance but, at most, was an agreement to negotiate.[16]

Valdez Fisheries argues that an internal Alyeska document—a May 1994 Authorization for Expenditure—obtained in discovery after the contract claim was dismissed resolves the ambiguity and substantiates Alyeska's intent to accept one particular offer. Valdez Fisheries theorizes that the Authorization for Expenditure set out the material price and duration terms by choosing the five-year, $43,000 payment alternative, thus removing any uncertainty about the contract terms. But Alyeska did not send this document to Valdez Fisheries in 1994. Indeed, Valdez Fisheries asserts on appeal that "Alyeska's execution of the [Authorization] was unknown" to Valdez Fisheries until 1997. Therefore, this internal memorandum could not have communicated to Valdez Fisheries Alyeska's acceptance of one of the offers and it could not have made certain terms that were otherwise unenforceably uncertain.[17]

Finally, Valdez Fisheries' complaint does not permit a reasonable inference that other facts not specifically plead might demonstrate unequivocal acceptance. We could hypothesize that Alyeska might have communicated acceptance via some other unspecified document sent in the period between the "winning bid" letter and the termination of contract negotiations.[18] In this case, however, the superior court was not required to make such a strained inference to salvage Valdez Fisheries' complaint.[19]

We cannot hold parties to a standard that requires them to effectively plead evidence prior to conducting discovery.[20] But even without discovery, Valdez Fisheries should have had access to any documents that might have supported its claim that Alyeska accepted an offer. As explained above, documents not transmitted to Valdez ·Fisheries before Alyeska terminated contract negotiations could not demonstrate unequivocal acceptance.[21]

Further, to the extent that Valdez Fisheries argues that dismissal of its contract claim was premature because it was entered prior to discovery, this argument must be rejected because subsequent litigation allowed Valdez Fisheries to correct any pleading deficiency and avoid any prejudice. Although the court dismissed the contract claim in 1995, it did not enter final judgment for Alyeska until July 1997. In the interim, Valdez Fisheries engaged in extensive discovery on its remaining claims, including its promissory estoppel and promise-to-negotiate claims. Because these claims depended

---

**15.** *See Davis,* 938 P.2d at 1006 (stating that an agreement is not enforceable if its essential terms are not reasonably certain) (citations omitted).

**16.** We likewise do not see how a court could enforce the alleged contract. Based on the proposal and Alyeska's response, a court could not order specific performance or calculate damages for breach.

**17.** Acceptance requires a reasonable manifestation of assent to the terms of the offer. RESTATEMENT (SECOND) OF CONTRACTS § 50 (1979). Except in unusual circumstances not present here, manifestation of acceptance by promise requires a reasonable attempt to communicate this promise to the offeror. *See* RESTATEMENT (SECOND) OF CONTRACTS § 56 (it is generally "essential to an acceptance by promise ... that the offeree exercise reasonable diligence to notify the offeror of acceptance"); *id.* at § 69 cmt. a (offeree's silence or inaction generally cannot constitute acceptance). Even assuming the Authorization for Expenditure would have been an acceptance by promise had Alyeska communicated it to Valdez Fisheries, Alyeska made no attempt to do so. The Authorization for Expenditure simply provides no basis for determining that Alyeska manifested assent to Valdez Fisheries' offer. *See Zeman,* 699 P.2d at 1281–82 (stating that summary judgment on breach of contract claim is appropriate where no reasonable person could read purported acceptance as evidencing mutual assent); *see also Davis,* 938 P.2d at 1006.

**18.** As discussed *infra* at Part III.D.2., any oral communications would be unavailing under the statute of frauds even if they were unequivocal expressions of acceptance.

**19.** *Gooley,* 851 F.2d at 514 (noting that "court[s] need not conjure up unpled allegations or contrive elaborately arcane scripts" to save a complaint from dismissal).

**20.** *Cooperman,* 171 F.3d at 47 (citation omitted).

**21.** *Supra* note 18 and accompanying text.

upon similar facts, Valdez Fisheries effectively remained free to continue discovery that might have helped it revive its dismissed contract claim.

Valdez Fisheries indeed discovered facts which it relied upon in 1997 when it sought to revive its contract claim in its proposed second amended third-party complaint. But the second amended third-party complaint and the supporting motion papers submitted after eighteen additional months of discovery and investigation failed to point to any Alyeska document transmitted in 1994 to Valdez Fisheries, other than the "winning bid" letter discussed above, that arguably constituted an unequivocal acceptance of one of Valdez Fisheries' three offers.[22] Thus, even assuming the Rule 12(b)(6) dismissal was premature, it did not prejudice Valdez Fisheries. Valdez Fisheries had ample opportunity before final judgment to amend and reinstate its contract claim if it discovered relevant facts supporting that claim.

 While "the [Rule 12(b)(6)] threshold may be low, it is real—and it is the plaintiff's burden to take the step which brings his case safely into the next phase of litigation."[23] The facts alleged in the original and the second amended third-party complaints do not permit an inference of unequivocal acceptance. Because there was no acceptance, there is no contract upon which Valdez Fisheries can sue. On the face of the pleadings, therefore, Valdez Fisheries' contract claim was fatally flawed.

Accordingly, we affirm the superior court's dismissal of Valdez Fisheries' contract claim and Sea Hawk's third-party beneficiary claims.[24]

**C. As a Matter of Law, the Agreement to Negotiate Fails for Lack of Specificity.**

 Valdez Fisheries asserts that even if Alyeska's May 6 letter was not an acceptance of the bid offer, it was a binding agreement to negotiate. We will enforce agreements to negotiate.[25] Participation in negotiations, however, "does not necessarily mean that the parties will be able to agree on mutually-acceptable terms,"[26] and we will therefore enforce an agreement to negotiate only if it contains "a more specific way to resolve ... differences," such that we are able to discern when the agreement to negotiate has been breached.[27] That standard is not met here. At best, the proposal and Alyeska's reply letter are evidence of an agreement to negotiate that fails to spell out a method by which differences are to be resolved. We therefore affirm the superior court's dismissal of Valdez Fisheries' agreement-to-negotiate claim.

 Even if the agreement-to-negotiate claim were to proceed, Valdez Fisheries would only be entitled to recover costs associated with the negotiations themselves. Since an agreement to negotiate is not an agreement to agree,[28] any costs Valdez Fisheries incurred in anticipation of performance were not incurred in reasonable reliance on the agreement to negotiate. Further, any costs incurred in preparing the bid were incurred before Alyeska agreed to negotiate. They are therefore not recoverable under this theory.

Sea Hawk also argues that it has a claim against Alyeska for breach of the duty to negotiate. Like Sea Hawk's third-party beneficiary claim against Alyeska, this claim de-

---

**22.** Valdez Fisheries argues that it did not obtain the Authorization for Expenditure until several weeks after the court denied its proposed second amended complaint. As discussed above, however, the Authorization for Expenditure could not support an inference that Alyeska accepted Valdez Fisheries' offer because it was never communicated to Valdez Fisheries.

**23.** *Gooley,* 851 F.2d at 515 (citation omitted).

**24.** Sea Hawk cannot be a third-party beneficiary in the absence of a valid contract between Alyeska and Valdez Fisheries.

**25.** *See Davis,* 938 P.2d at 1008–09 ("In theory, an agreement to negotiate is an enforceable contract in the sense that the parties can be made to participate in negotiations.").

**26.** *Id.*

**27.** *Id.* at 1009.

**28.** *See id.*

pends upon Valdez Fisheries' claim because Alyeska never entered into any agreement to negotiate with Sea Hawk. Therefore, our rejection of Valdez Fisheries' duty-to-negotiate claim requires us to affirm the dismissal of Sea Hawk's duty-to-negotiate claim.

### D. The Superior Court Did Not Err in Dismissing Valdez Fisheries' Promissory Estoppel Claims.

■ Valdez Fisheries makes two separate promissory estoppel arguments. First, it argues that Alyeska's "congratulations, you are the winning bidder" letter constituted a promise; second, it argues that Alyeska orally promised that "if it accepted [Valdez Fisheries'] proposal, it would lease the Sea Hawk facility from [Valdez Fisheries]." Under Alaska law, a promise that induces action will bind the promisor only if it satisfies all four elements of promissory estoppel:

(1) The action induced amounts to a substantial change of position; (2) it was either actually foreseen or reasonably foreseeable by the promisor; (3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and (4) enforcement is necessary in the interest of justice.[29]

We address each alleged promise separately.

#### 1. The alleged written promise contained in Alyeska's May 6 letter

■ When a promissory estoppel claim is made in conjunction with a breach of contract claim, the "actual promise" element of promissory estoppel is "analytically identical to" the " 'acceptance' required for a contract." [30] Were it otherwise, promissory estoppel, which is intended "to enable courts to enforce contract-like promises made unenforceable by technical defects or defenses," [31] would become a device by which parties could be held to contracts they did not ac-

cept. As we have already held, Alyeska's May 6 letter did not accept an offer to contract. It therefore was not an "actual promise," and thus fails as a matter of law to satisfy the "actual promise" element of promissory estoppel.

■ The letter is also deficient as a promise to negotiate. Regarding negotiations, the letter states only that "[w]e intend to begin the process of negotiating a contract as soon as possible." This is a statement of present intent, not a promise.[32] This statement therefore also fails as a matter of law to satisfy the "actual promise" element of promissory estoppel.

■ Moreover, even treating this statement as a promise, it would not be sufficiently definite to allow enforcement. At best, it is a promise "to begin negotiations." It appears from the third-party complaint that negotiations were begun. To be enforceable, a promise to negotiate must spell out the method by which a court will determine whether or not the promise was breached.[33] Although *Davis v. Dykman*[34] considered only a contract to negotiate, not promissory estoppel, its reasoning is instructive here. Since the third-party complaint does not plead facts which, if accepted as true, establish a breached promise to negotiate, we affirm the superior court's dismissal of Valdez Fisheries' promissory estoppel claims based on Alyeska's May 6 letter.

#### 2. McHale's alleged promise

■ Valdez Fisheries' third-party complaint alleged that Alyeska's McHale promised in a January 1994 conversation with David Cobb, Valdez Fisheries' business manager, that "if Alyeska approved [Valdez Fisheries'] proposal as best meeting Alyeska's requirements, Alyeska would lease the facility from [Valdez Fisheries]." [35] Alaska's stat-

**29.** *Zeman,* 699 P.2d at 1284.

**30.** *Brady v. State,* 965 P.2d 1, 11 (Alaska 1998).

**31.** *Id.* at 10.

**32.** *See id.* (drawing distinction between unequivocal acceptance and comments about timing and capacity such as " '[w]e can be prepared to sign ... make that contract ... sign that contract ... on the day they sign the classification order.' ").

**33.** *Davis v. Dykman,* 938 P.2d 1002, 1009 (Alaska 1997).

**34.** 938 P.2d 1002, 1009 (Alaska 1997).

**35.** Alyeska argues that this court cannot consider McHale's alleged promise because it was not set out in Valdez Fisheries' original third-party complaint. But Valdez Fisheries' first amended third-party complaint, which was partially ac-

ute of frauds renders certain "agreement[s], promise[s], or undertaking[s] ... unenforceable unless [they are] in writing...."[36] The alleged oral promise at issue here falls under the statute of frauds because it is "an agreement for leasing for a longer period than one year ... or of any interest in real property...."[37]

The RESTATEMENT (SECOND) OF CONTRACTS provides that promissory estoppel can bind a promisor notwithstanding the statute of frauds.[38] In *Alaska Democratic Party v. Rice*, we endorsed this view as to employment contracts.[39] We explicitly limited this holding to employment contracts, perhaps in recognition of the frequency of oral employment agreements and the extent to which the main terms of an employment contract are generally well understood.[40] The present case is markedly different because the duration of the alleged promise is indiscernible.

 The statute of frauds serves many purposes. First, it provides certain, consistent, and predictable principles to guide negotiators.[41] It recognizes the inherent evidentiary worth of written evidence, and the potential injustice created by relying on the memories of interested parties to provide the exact language of an agreement, which is necessary to discern the limits of the promise.[42] It also recognizes the natural tendency of peoples' memories to contour the words they recall to fit their understanding of the agreement.[43] The statute of frauds encourages people to commit their agreements to writing, and the process of putting the agreement in writing helps impress upon them the importance of their agreements.[44]

It reduces litigation over alleged oral contracts.[45] Finally, a limited application of exceptions to the statute of frauds preserves the legislative intent behind the statute, and gives effect to the legislative judgment that the benefits conferred by the statute outweigh the potential injustice produced by its application.[46]

 The facts here implicate the concerns motivating the statute of frauds. We therefore decline to extend *Alaska Democratic Party* to cases involving the sale or lease of real estate, in which the purported oral agreement is ambiguous as to key terms. In such circumstances, promissory estoppel cannot be used to defeat the statute of frauds' requirement that a writing memorialize the parties' agreement. We therefore affirm the superior court's dismissal of Valdez Fisheries' promissory estoppel claims as to the oral promise.

### E. The Superior Court Did Not Err in Dismissing Sea Hawk's Promissory Estoppel Claims on Summary Judgment.

Sea Hawk argues that the superior court erred by failing to apply promissory estoppel to negate the effect of the statute of frauds. It reasons that dismissing Sea Hawk's promissory estoppel claim is inconsistent with our holding in *Alaska Democratic Party* that a promise is enforceable notwithstanding the statute of frauds if it meets the other elements of a promissory estoppel claim.

 The superior court granted Alyeska summary judgment on Sea Hawk's

cepted by the superior court, pleads the McHale promise. The superior court granted Valdez Fisheries' motion to amend some of its claims, including "its good faith/reasonable efforts and promissory estoppel claims against Alyeska." The McHale promise is part of the promissory estoppel claims.

36. AS 09.25.010(a).

37. AS 09.25.010(a)(6).

38. RESTATEMENT (SECOND) OF CONTRACTS § 139 (1981).

39. 934 P.2d 1313, 1316–17 (Alaska 1997).

40. *Id.*

41. *See* David J. Gass, *Michigan's UCC Statute of Frauds and Promissory Estoppel*, 74 MICH. B.J. 524, 526 (1995) (listing general reasons given for statute of frauds in survey of cases).

42. *See id.* at 527.

43. *See id.*

44. *See id.*

45. *See id.*

46. *See id.* at 527–28.

promissory estoppel claims. Sea Hawk alleges that McHale "specifically promised . . . that [Valdez Fisheries] would get the Alyeska contract . . . if Sea Hawk sold its plant to [Valdez Fisheries]." Sea Hawk also alleges that Alyeska promised that "if for any reason Alyeska did not lease the Sea Hawk plant from [Valdez Fisheries], Alyeska would lease the Sea Hawk plant directly from Sea Hawk on the same terms and conditions." Thus we have alleged promises for the lease of real estate, with substantial ambiguity · as to terms.

The first alleged promise, that Alyeska would lease from Valdez Fisheries, is ambiguous as to the duration and price. It appears to report present intentions rather than promise future actions, and as such it is unenforceable.[47] This reading is supported by the second alleged promise, made in the same conversation, which clearly anticipates Alyeska's refusal to lease from Valdez Fisheries. The second promise is also ambiguous as to the duration and price of the lease, and presumes that a complete, unambiguous agreement would be reached between Alyeska and Valdez Fisheries, and that Sea Hawk could simply step into Valdez Fisheries' shoes.

Moreover, the promises alleged by Sea Hawk were oral, and implicate the same statute of frauds concerns as the oral promises made to Valdez Fisheries. We hold that promissory estoppel cannot be used to defeat the statute of frauds' requirement that an agreement for a lease with a term that exceeds one year must be in writing where, as here, the purported oral agreement contains substantial ambiguity as to key terms. We therefore affirm the superior court's grant of summary judgment on Sea Hawk's promissory estoppel claims.

### F. The Superior Court Permissibly Declined to Sanction Alyeska for Its Conduct in Discovery.

Valdez Fisheries contends that it was error not to sanction Alyeska for failing to produce "crucial smoking gun documents"

until less than a month before trial. Valdez Fisheries argues that Alyeska's internal Authorization for Expenditure is particularly significant. The Authorization for Expenditure is an internal Alyeska request for funding for the wildlife rehabilitation center. It summarizes the project, gives reasons for the project, and lists the project costs as $2,580,000 for a five-year lease with a renewal option. McHale signed the Authorization for Expenditure, although the signature lines for the approving president and vice-president are blank. Valdez Fisheries argues that the Authorization for Expenditure proves which of the three leasing options Alyeska chose, and thus removes any uncertainty about the contract terms.

The superior court declined to sanction Alyeska, holding that the information contained in the document "is not new, doesn't seem to be critical, does not support the claim for relief against Alyeska and there was no improper discovery conduct." We review discovery sanctions for abuse of discretion[48] and findings of fact for clear error.

Valdez Fisheries' argument that the Authorization for Expenditure is a "smoking gun" depends on its theory that it provides the missing terms of the lease agreement. As a matter of law, the document is not itself an acceptance because it was never communicated to Valdez Fisheries—the offeror. Valdez Fisheries argues that the document manifests Alyeska's intent as to terms. But the specific terms considered internally by Alyeska are irrelevant absent an acceptance.

Valdez Fisheries has not demonstrated that the superior court erred in concluding that the information provided by the newly produced evidence, including the Authorization for Expenditure, was not critical and did not support the claims against Alyeska. We conclude that it did not abuse its discretion by declining to impose sanctions. We therefore affirm the oral order declining to sanction Alyeska.

---

47. *See Brady,* 965 P.2d at 10.

48. *Christensen v. NCH Corp.,* 956 P.2d 468, 473 (Alaska 1998).

### G. The Superior Court Did Not Improperly Deny Leave to Amend Valdez Fisheries' Third–Party Complaint.

██ Valdez Fisheries moved to amend its third-party complaint against Alyeska, arguing that various internal Alyeska documents supplied the contract terms, and that Alyeska misrepresented the status of the project. The superior court found that the proposed amendment would assert new claims for the tort of misrepresentation and for punitive damages, but that the facts giving rise to these claims were "largely coexistent" with the facts giving rise to Valdez Fisheries' prior claims, and that there was "no adequate reason" why Valdez Fisheries had not previously asserted the proposed new claims. Noting that trial was to begin in seven weeks, it also found that the resulting cost and preparation time would unduly prejudice Alyeska. It therefore denied the motion to amend. Valdez Fisheries argues that it was error not to grant its motion.

██ We review the denial of leave to amend for abuse of discretion.[49] We will reverse the superior court's order only if we are left with a definite and firm conviction that it erred in its ruling.[50]

██ Alaska Civil Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Leave to amend is liberally granted in Alaska.[51] But the superior court retains discretion to deny leave to amend on the eve of trial in a situation like this.[52]

This was Valdez Fisheries' third attempt to amend its claims against Alyeska. Valdez Fisheries argues that the claims were newly discovered, but the superior court found that they were based on facts already known to Valdez Fisheries. This finding was not clearly erroneous. Although Valdez Fisheries discovered new details during depositions it took in 1997, and requested and received documents from Alyeska concerning these details, the main thrust of the information was not new. We therefore affirm the superior court's denial of leave to amend the third-party complaint.

Because we have affirmed the superior court's holdings, Valdez Fisheries has no remaining claims against Alyeska. It is therefore unnecessary for us to reach the question whether the superior court erred in limiting Valdez Fisheries' damages to its costs associated with negotiations.

### H. The Superior Court Did Not Err in Dismissing Sea Hawk's Negligent Misrepresentation and Omission Claim.

██ Sea Hawk argues that it was error to dismiss its claim that Alyeska misrepresented its intentions to lease the Sea Hawk facility. Sea Hawk alleges that in January 1994 McHale made promises to Sea Hawk although he knew that Alyeska harbored internal misgivings about the project. Holding that there was no duty to disclose, the superior court dismissed this claim on summary judgment.

██ The four elements of the tort of negligent misrepresentation are:

First, the party accused of the misrepresentation must have made the statement "in the course of his [or her] business, profession or employment, or in any other transaction in which [s/]he has a pecuniary interest." Second, the representation must supply "false information." Third, there must be "justifi[ ]able reliance" on the false information supplied. Finally, the accused party must have failed "to exercise reasonable care or competence in obtaining or communicating the information." [53]

**49.** *Betz v. Chena Hot Springs Group,* 742 P.2d 1346, 1348 (Alaska 1987).

**50.** *Id.*

**51.** *See, e.g., Betz,* 742 P.2d at 1348.

**52.** *Neal & Co. v. City of Dillingham,* 923 P.2d 89, 95 (Alaska 1996).

**53.** *Bubbel v. Wien Air Alaska, Inc.,* 682 P.2d 374, 380 (Alaska 1984) (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)).

We do not see how McHale and Cesarini's casual conversations in January 1994, some four months before Alyeska sent its May 6 "winning bid" letter to Valdez Fisheries' proposal, could have created an ongoing duty to advise Sea Hawk of Alyeska's June 1994 misgivings. Sea Hawk has not demonstrated a genuine dispute about whether McHale's alleged January 1994 assurances were false when made. A statement made as to future intentions and actions is not a misrepresentation if it is accurate when it is made, even if future events render it inaccurate.[54]

Sea Hawk argues that once Alyeska represented its intentions in January, it had a duty to alert Sea Hawk if its intentions changed. Such a holding would stretch the negligent misrepresentation doctrine in Alaska. We have held that "[a] duty to disclose is rarely imposed where the parties deal at arm's length...."[55] The dealings between Alyeska and Sea Hawk, as evidenced by the infrequency of their conversations, were at arms length. Sea Hawk has consequently not demonstrated that a reasonable jury could find that Sea Hawk's alleged reliance on these four-month-old assurances was reasonable. There is no issue of fact about whether Alyeska misled Sea Hawk after Alyeska allegedly changed its intentions, because Sea Hawk had not claimed that it made post-change attempts to obtain Alyeska's confirmation of McHale's alleged January representations to Sea Hawk.

Because we find that the evidence in the record would support a limited duty at best, and because Sea Hawk's actions in reliance were not reasonable given the limited nature of this duty, we affirm the superior court's dismissal of Sea Hawk's negligent misrepresentation and omission claim on summary judgment.

**I. It Was Not an Abuse of Discretion to Deny Alyeska's Request for Attorney's Fees Exceeding the Usual Twenty Percent.**

Alyeska argues on cross-appeal that the superior court erred by awarding Alyeska twenty percent of the fees it had incurred,[56] rather than enhanced fees under a percentage exceeding twenty percent.[57] We will not reverse an award of costs and fees absent "a clear abuse of discretion."[58] We will not find a clear abuse of discretion unless the award is arbitrary, capricious, manifestly unreasonable, or the result of an impermissible motive.[59] An award that tracks the scheduled fee award of Alaska Civil Rule 82 is presumptively valid.[60]

Alyeska has not demonstrated that awarding twenty percent of its fees was arbitrary, capricious, or manifestly unreasonable. Alyeska's arguments demonstrate, at best, that reasonable minds could disagree about the appropriate amount. The record reveals vigorous litigation which the superior court did not find to be vexatious. Alyeska has not shown that the record compels a finding that Valdez Fisheries and Sea Hawk's actions were excessively litigious or vexatious, and has hence failed to demonstrate a clear abuse of discretion. We therefore affirm the superior court's award of attorney's fees.

**IV. CONCLUSION**

For these reasons we AFFIRM in all respects.

BRYNER, Justice, dissenting.

I disagree with the court's conclusion that Valdez Fisheries' third-party complaint against Alyeska was properly dismissed under Alaska Rule of Civil Procedure 12(b)(6).

Civil Rule 12(b)(6) permits the court to dismiss a complaint that fails to state a viable claim.[1] We have frequently held that mo-

---

**54.** *Id.* at 381.

**55.** *Matthews v. Kincaid,* 746 P.2d 470, 472 (Alaska 1987).

**56.** *See* Alaska R. Civ. P. 82(b)(2).

**57.** *See* Alaska R. Civ. P. 82(b)(3).

**58.** *State v. Alaska Int'l Air, Inc.,* 562 P.2d 1064, 1067 (Alaska 1977).

**59.** *Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 44 (Alaska 1998) (citations omitted).

**60.** *Reid v. Williams,* 964 P.2d 453, 460 (Alaska 1998) (citation omitted).

**1.** Rule 12(b) provides:

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, coun-

tions to dismiss are disfavored[2] and have urged that complaints be "give[n] … the benefit of the doubt."[3] In determining whether a claim is sufficiently stated, courts must read the complaint in the light most favorable to the claimant and deem all alleged facts and reasonable inferences arising therefrom as if they were true.[4] A complaint that is merely vague or lacks detail is not fatally flawed;[5] instead, it suffices "if the allegations provide for relief on any possible theory."[6] Hence, a complaint will withstand challenge under Rule 12(b)(6) as long as it "set[s] forth allegations of fact consistent with and appropriate to some enforceable cause of action" and provides a framework for future evidence demonstrating entitlement to the requested relief.[7] "A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' "[8] or unless the complaint itself rules out the possibility that a valid claim exists.[9]

In applying these principles to a given case, we must also bear in mind Alaska's traditionally lenient notice pleading standards. Civil Rule 8 simply requires that a complaint include "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks."[10] The rule further advises that "[e]ach averment of a pleading shall be simple, concise and direct. No technical forms of pleading or motions are required."[11] We have not construed this rule to require details of evidence that a claimant will offer to establish a claim; to the contrary, we have emphasized that the rule is satisfied by a brief statement that "give[s] the defendant fair notice of the claim and the grounds upon which it rests."[12]

Disregarding these well-established principles, the court holds Valdez Fisheries' breach-of-contract claim facially deficient for neglecting to affirmatively plead specific facts that unequivocally establish the ele-

---

terclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: … (6) failure to state a claim upon which relief can be granted.… If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

2. *E.g., Kollodge v. State,* 757 P.2d 1024, 1026 (Alaska 1988); *Reed v. Municipality of Anchorage,* 741 P.2d 1181, 1184 (Alaska 1987); *Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 791 (Alaska 1986).

3. *Knight,* 714 P.2d at 791.

4. *Kollodge,* 757 P.2d at 1026; *Guerrero v. Alaska Hous. Fin. Corp.,* 6 P.3d 250, 253 (Alaska 2000).

5. *Knight,* 714 P.2d at 791; *see also Shannon v. City of Anchorage,* 429 P.2d 17, 19 (Alaska 1967). ("The complaint alleged that appellee was negligent in failing to fulfill its duty of furnishing Jacob's ladders for use of [plaintiff]. That was all that was necessary to state a claim for relief. It was unnecessary to state the evidential facts upon which such a duty was founded.… If appellee needed more facts, it could call for them

under Civil Rule 12(e) or obtain them by utilization of the rules relating to discovery.") (citations omitted).

6. *Knight,* 714 P.2d at 791 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 602 (1969)).

7. *Linck v. Barokas & Martin,* 667 P.2d 171, 173 (Alaska 1983).

8. *Shooshanian v. Wagner,* 672 P.2d 455, 461 (Alaska 1983) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

9. *Guerrero,* 6 P.3d at 253–58 (allowing dismissal only if it was "beyond doubt" that plaintiff could not factually support a claim for relief).

10. Alaska R. Civ. P. 8(a).

11. Alaska R. Civ. P. 8(e)(1).

12. *Sykes v. Melba Creek Mining, Inc.,* 952 P.2d 1164, 1168 n. 4 (Alaska 1998); *cf. Gamble v. Northstore P'ship,* 907 P.2d 477, 481–83 (Alaska 1995) (stating that "[a]n affirmative defense is adequately pleaded if it provides the opponent fair notice of the nature of the defense" and deeming an answer that stated, "Plaintiffs are barred by estoppel" and "Plaintiffs are barred by res judicata" as sufficient to raise affirmance as an affirmative defense because the pleaded defenses "invok[ed] some of the same concerns in general terms").

ments of a valid contract.[13] More particularly, because it notes that "[a] valid contract requires 'unequivocal acceptance by the offeree,' " the court demands that "Valdez Fisheries' third-party complaint directly or inferentially [must] contain[ ] ... factual allegations [that] could be considered an unequivocal expression of acceptance."[14] By effectively requiring that Valdez Fisheries' third-party complaint be dismissed for failing to particularly plead *all* facts justifying recovery, the court's ruling inverts the usual principle that condones dismissal under Rule 12(b)(6) only "where the complaint ... 'presents *no* set of facts justifying recovery.' "[15]

The court's ruling also conflicts with Civil Rule 8's lenient notice pleading requirement. *Great Western Savings Bank v. George W. Easley Co., J.V.*[16] usefully illustrates the conflict. There Great Western appealed an award in favor of Easley for breach of contract, arguing that the contract claim should have been kept from the jury because Easley's complaint failed to allege a necessary element for a valid contract—consideration.[17] We rejected that argument, unequivocally ruling that Civil Rule 8 does not require a complaint to affirmatively plead contract elements:

> Alaska is a notice pleading state. Alaska R. Civ. P. 8(a). The rules merely require "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests. Easley Company's second amended complaint alleged that Great Western had a contractual obligation to make direct payments to Easley Company. It further alleged that Great Western breached this contract and that Easley Company suffered damages. Easley Company's complaint sufficiently put Great Western on notice of the claims against it and of the grounds upon which they rested. There was no need to allege consideration. The second amended complaint satisfied the requirements of Civil Rule 8(a).[18]

*Great Western* thus allows breach-of-contract claims to go forward without specifically pleading the elements of contract formation, making it clear that a complaint gives the defendant sufficient notice if it generally alleges that a contract existed and was breached in a way that damaged the plaintiff.[19]

In demanding that a complaint specifically plead all contract elements, then, the court's opinion today ignores the plain language of Civil Rule 8 and overturns settled precedent that interprets Rule 8 to eschew particularized pleading of contract elements. Furthermore, the opinion implicitly conflicts with Alaska Civil Rule 9, which *does* require particularized pleading for certain special matters, but conspicuously does not extend its particularized pleading requirement to contract elements.[20] Indeed, Rule 9(c) effective-

---

**13.** Op. at 665–666

**14.** *Id.* at 665.

**15.** The opinion expressly acknowledges this principle. *See* Op. at 665 (quoting *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47 (1st Cir.1999) (emphasis added)).

**16.** 778 P.2d 569 (Alaska 1989).

**17.** *Id.* at 577–78.

**18.** *Id.*

**19.** *See id.*

**20.** For example, Civil Rule 9(a) requires specificity in pleading capacity, Rule 9(b) requires specificity in pleading fraud, mistake, and condition of mind, and Rule 9(h) requires specificity as to items of special damage:

(a) Capacity. It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of and organized association of persons that is made a party, except to the extent required to show the jurisdiction of the court. When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, the party desiring to raise the issue shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.

(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

. . . .

ly requires defendants to plead the *absence* of contract elements, stating that claimants need only aver "the performance or occurrence of conditions precedent" "generally," while explicitly assigning to defendants the duty to plead denial of performance or occurrence of conditions precedent "specifically and with particularity." [21]

In the present cases, paragraph 59 of Valdez Fisheries' third-party complaint alleges that

> [a] valid and enforceable contract was made between Alyeska and [Valdez Fisheries] pursuant to which [Valdez Fisheries'] agreed to acquire and modify the Sea Hawk Facility in Valdez according to certain and stated specifications and Alyeska agreed to lease the modified facility from [Valdez Fisheries] on certain and stated terms.

Under Civil Rule 8's notice pleading standards, this paragraph alone pleads the existence of a contract with sufficient clarity to place Valdez Fisheries' contract claim beyond reach of a Rule 12(b)(6) motion. To my knowledge, this court has never before ruled that a complaint for breach of contract must, in addition to pleading that a contract existed and was breached, affirmatively recite all necessary contract elements; nor has this court previously suggested that the element of acceptance must be described by specific "factual allegations [that] could be considered an unequivocal expression of acceptance." [22] The court's newly adopted specific-pleading requirement is a sharp break from our settled law and will surely come as a rude surprise to many Alaska lawyers who have drafted, and currently have pending, contract complaints that rely on Alaska's hitherto flexible and common-sense pleading requirements.

But even under today's newly declared specific-pleading standard, I think that Valdez Fisheries' third-party complaint states a facially viable claim for breach of contract. In my view, the court mischaracterizes the winning bid letter as containing the complaint's only "pertinent allegations" of Alyeska's acceptance. Paragraph 48 of the third-party complaint quotes Alyeska's winning bid letter, prefacing the quotation by simply describing it as a response to Valdez Fisheries' earlier bid submittals. The prefatory language says nothing else: it neither explicitly nor implicitly purports to characterize the May 26, 1994, letter as Alyeska's unequivocal acceptance—let alone as Valdez Fisheries' sole evidence of acceptance.

In the next paragraph, though, the third-party complaint does specifically allege an acceptance—an event that this paragraph implicitly alleges occurred on June 3, 1994, a full month *after* Alyeska's winning bid letter:

> On June 3, 1994, representatives of Alyeska and [Valdez Fisheries] met at Alyeska's offices in Anchorage, Alaska. The matters discussed at this meeting included the planning and scheduling of the "project" and the "contract structure." *At this meeting, the attorneys for Alyeska and [Valdez Fisheries] discussed the preparation of a document incorporating the terms that had been proposed by [Valdez Fisheries] **and accepted** by Alyeska.* The attorney[ ]s agreed that the appropriate document would be a lease agreement. [Valdez Fisheries] asked Alyeska if Alyeska had a "boilerplate" lease agreement that the parties could use as a framework for the agreement. Alyeska replied that it did not have such a document, whereupon [Valdez Fisheries] agreed to provide a "boilerplate draft" of the document.[23]

Two paragraphs later, in paragraph 51, the complaint alleges that Valdez Fisheries sent Alyeska a "boilerplate draft" to serve as the contract's "framework." In its ensuing paragraphs—paragraphs 52–54—the complaint

---

(h) Special Damage. When items of special damage are claimed, they shall be specifically stated.

**21.** Civil Rule 9(c) provides:

Conditions Precedent. In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity.

**22.** Op. at 665.

**23.** Emphasis added.

describes Alyeska's subsequent acts reneging on its contractual commitment. And as already noted above, the complaint then proceeds to repeat its specific allegation of acceptance in paragraph 59 by realleging the existence of "[a] valid and enforceable contract ... between Alyeska and [Valdez Fisheries] pursuant to which ... Alyeska agreed to lease the modified facility from [Valdez Fisheries] on certain and stated terms." Like the language of paragraph 49, this language pleads an unequivocal acceptance; and nothing in this language purports to confine its allegation of acceptance to the winning bid letter's language or to negate paragraph 50's allegation that an acceptance occurred at or around the time of the June 3 meeting.

Of course I recognize that a complaint can become vulnerable to dismissal under Rule 12(b)(6) if it affirmatively pleads too much and establishes a fatal flaw—some specific fact whose existence categorically precludes recovery and demonstrates "that there is some insuperable bar to relief."[24] But my reading of the entire third-party complaint in the light most favorable to Valdez Fisheries (the reading that we must adopt for purposes of evaluating the propriety of a Rule 12(b)(6) dismissal)[25] fails to reveal any such affirmatively stated fatal flaw. Valdez Fisheries undeniably does quote Alyeska's winning bid letter; so too, it relies on the letter as part of its claim for breach of contract damages; but the third-party complaint nowhere touts the winning bid letter as an unequivocal acceptance per se, and it never implicitly or explicitly disclaims the existence of other evidence that would prove Alyeska's unequivocal acceptance.

To the extent that the court's opinion gleans any "insuperable bar" from the complaint inferentially, the court necessarily violates the interpretive rule that requires it to give Valdez Fisheries "the benefit of all reasonable inferences" in determining whether its complaint passes muster under Rule 12(b)(6).[26] When read in its entirety and taken as true, then, the third-party complaint meets even the newly imposed and unjustifiably stringent demand for allegations that "directly or inferentially" "could be considered an unequivocal expression of acceptance."[27]

Yet the court's opinion nonetheless refuses to discuss—or even to acknowledge—any allegation of acceptance in the complaint other than Alyeska's winning bid letter. The opinion rests its refusal to consider anything but the winning bid letter on two related legal assumptions: The opinion assumes that an "unequivocal acceptance" could not occur unless Valdez Fisheries alleged that Alyeska specifically agreed to accept one of Valdez Fisheries' three alternative lease proposals[28] and it further assumes that the statute of frauds would bar any oral acceptance by Alyeska.[29] Yet neither assumption bears up to scrutiny.

First, the opinion broadly posits that an unequivocal acceptance could not have occurred—and therefore no valid contract could possibly have arisen—unless Alyeska specifically accepted, and communicated its acceptance of, one of Valdez Fisheries' three alternative lease proposals:

Even if we were to interpret Alyeska's letter to say unequivocally that "we accept your offer," we could not say which of the three offers it was accepting, and whether Alyeska was agreeing to lease the property for five years, seven years, or ten years, with monthly rent payments of $43,000, $40,000, or $35,000, respectively. Duration and price are important contract terms. Such great differences in important contract terms preclude finding a meeting of minds. The significant differences in the alternatives confirm that the May 6 letter

---

24. 5A CHARLES ALAN WRIGHT & ARTHUR R. LLER, Federal Practice and Procedure § 1357, at 344 (2d ed.1990). For a good example of such a case, see *Ahwinona v. State*, 922 P.2d 884, 886 (Alaska 1996).

25. *Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 253 (Alaska 2000); *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1988).

26. *See* Op. at 665 (quoting *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47 (1st Cir.1999)).

27. Op. at 665.

28. *See* Op. at 665–666.

29. *See* Op. at 666, note 18; 668–669.

was not an unequivocal acceptance but, at most, was an agreement to negotiate.[30]

The opinion further professes that the court would be incapable of determining the legal consequences of a breach, even if a contract could somehow have arisen: "We likewise do not see how a court could enforce the alleged contract. Based on the proposal and Alyeska's response, a court could not order specific performance or calculate damages for breach." [31]

But universally recognized contract law contradicts these assumptions. Professor Corbin expressly describes the kind of agreement at issue here as a commonly accepted and routinely enforced "alternative contract":

> An alternative contract is one in which a party promises to render some one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party. The choice among these alternatives, the power of election, is usually given to the promisor; but it need not be. If the option is in the promisor, he has power to discharge his contractual duty by performing either alternative.... The breach of such a contract consists either in a repudiation of [the promisor's] contractual duty by the promisor or in [the promisor's] failure to perform any and all of the alternatives provided in the contract.[32]

And according to Corbin, "[f]or such a breach the measure of damages recoverable by the promisee is the value of that alternative that is the least burdensome and expensive to the promisor." [33]

This court has expressly recognized the validity of alternative contracts on at least two past occasions.[34] And there appears to

be no reason why the same kind of agreement would not be enforceable in this case. Here, Valdez Fisheries unequivocally offered Alyeska the choice of any one of three alternative lease provisions, each one definite and unambiguous in its own right and all equally and unconditionally acceptable to Valdez Fisheries. Alyeska's winning bid letter may not itself have been an unequivocal acceptance because it only proposed to "negotiate" Valdez Fisheries' offer. But if Alyeska later gave Valdez Fisheries an unequivocal commitment to proceed with a contract that allowed Alyeska its choice of these three alternatives—as paragraph 49 of the third-party complaint implicitly alleges Alyeska did at the June 3, 1994, meeting—then Alyeska would have entered into a valid and enforceable "alternative contract," notwithstanding its reservation of the right to elect alternatives. And correspondingly, upon Alyeska's subsequent breach, Valdez Fisheries would be entitled to recover damages measured by the shortest of the three lease proposals (and, presumably, by any reasonably foreseeable consequential damages that Valdez Fisheries incurred as a result of Alyeska's breach of that provision).[35]

The second assumption driving the court's refusal to acknowledge any allegation of acceptance in the third-party complaint, other than paragraph 48's reference to the winning bid letter, rests on the statute of frauds. Referring to its discussion of the statute of frauds in connection with the separate estoppel claim that Valdez Fisheries bases on McHale's alleged verbal promises, the opinion reasons that "any oral communications [concerning the alleged Alyeska/Valdez Fisheries' contract] would be unavailing under the statute of frauds even if they were unequivocal expressions of acceptance." [36] Yet

---

**30.** Op. at 665 – 666 (citations omitted).

**31.** Op. at 666, note 16.

**32.** 5 Arthur Linton Corbin, Corbin on Contracts, § 1079, at 453–54 (1964) (citations omitted).

**33.** *Id.* at 454; *see also* Restatement of Contracts § 344, at 565 (1933), *as quoted in McBain v. Pratt,* 514 P.2d 823, 827 (Alaska 1973) ("The damages for breach of an alternative contract are determined in accordance with that one of the

alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.").

**34.** *See Uchitel Co. v. Telephone Co.,* 646 P.2d 229, 236–37 (Alaska 1982); *McBain v. Pratt,* 514 P.2d at 827.

**35.** *See* sources cited *supra* note 33.

**36.** *See* Op. at 666, note 18.

this assertion lacks merit for two independent reasons: it overstates the statute of frauds' substantive requirements, and it relies on an impermissible procedural theory for dismissal under Rule 12(b)(6).

The statute of frauds reflects pragmatic concerns, and so has been uniformly interpreted to place substance over form. As Professor Corbin emphasizes, it has not been construed to require a formal or complete written contract and should be flexibly applied on a case-by-case basis to accept any writing that realistically dispels the danger of fraud:

> [W]e should always be satisfied with "some note or memorandum" that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement.[37]

Alaska has followed Professor Corbin's view of the statute, holding that a writing, even if not formal or complete, satisfies the statute as long as it avoids any serious possibility that enforcing the contract would result in perpetrating a fraud.[38]

Under this practical view of the statute, it might be perfectly sensible to bar the promissory estoppel claim that Valdez Fisheries bases exclusively on McHale's alleged verbal promise: that promise was at most an informal, non-contractual, and unauthorized oral assurance made even before Alyeska issued its invitation to bid; and it is evidently unsupported by any reasonably contemporary corroborating notation. By contrast, when the statute's flexible analysis is applied to Valdez Fisheries' direct contract claim against Alyeska, the outcome changes dramatically: for if Alyeska's Authorization for Expenditure is viewed in conjunction with Alyeska's invitations to bid, Valdez Fisheries'

specific responses, Alyeska's winning bid letter, the parties' subsequent correspondence relating to the June 3, 1994, meeting, and the "boilerplate" contract that Valdez Fisheries then sent to Alyeska, the Authorization for Expenditure would easily satisfy the statute of frauds' basic goal of erasing all "serious possibility of consummating a fraud by enforcement."[39] And by so doing, it would allow Valdez Fisheries to prove its claim through any otherwise admissible evidence of an oral acceptance. The fact that Alyeska's Authorization for Expenditure was internally generated and was never communicated to Valdez Fisheries certainly might preclude the authorization itself from being deemed a valid acceptance. But this same fact would have no bearing on the Authorization's ability to satisfy the separate and distinctly narrower concerns of the statute of frauds, thus opening the door to proof of an oral acceptance.

And in any event, because the third-party complaint does not categorically rule out the possibility of a written acceptance, Alyeska cannot properly invoke the statute of frauds as a basis for a Rule 12(b)(6) dismissal. As this court has previously recognized, even though the statute of frauds is generally considered an affirmative defense, it can sometimes be properly raised by a motion to dismiss under Rule 12(b)(6)—but only when this defense is unequivocally established on the face of the complaint, as, for example, when the complaint defeats itself by explicitly alleging a sale of land based on an oral agreement.[40] By contrast, in any more equivocal circumstances—for example, even when a plaintiff's "opposition to the motion to dismiss framed its arguments *as though* only an oral agreement was asserted as the basis for relief"—we have specifically held that if the "complaint did not clearly allege [the fact of an oral agreement,] . . . dismissal could be viewed as inappropriate for that reason."[41]

**37.** 2 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 498, at 681 (1950) (citations omitted), *as quoted in Fleckenstein v. Faccio*, 619 P.2d 1016, 1020 (Alaska 1980).

**38.** *Merdes v. Underwood*, 742 P.2d 245, 253 (Alaska 1987); *Fleckenstein v. Faccio*, 619 P.2d at 1020.

**39.** 2 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 498, at 681 (1950) (citations omitted), *as quoted in Fleckenstein v. Faccio*, 619 P.2d at 1020.

**40.** *See Martin v. Mears*, 602 P.2d 421, 427–28 (Alaska 1979).

**41.** *Id.* (emphasis added).

Here, then, because the third-party complaint did not "clearly allege" an oral acceptance, dismissal for violation of the statute of frauds could properly be granted before summary judgment.

For these reasons, I would hold that Valdez Fisheries' third-party complaint sets forth a facially plausible claim for breach of contract that could not properly be dismissed under Rule 12(b)(6).[42] I therefore dissent from the court's decision to affirm the superior court's order dismissing the claim.

**42.** The opinion's alternative theory of harmless error is unpersuasive because it impermissibly regards Valdez Fisheries' proposed amended third-party complaint as if it had been submitted as a response to a summary judgment motion.

Here, Alyeska never filed a summary judgment motion and submitted no materials outside the pleadings in seeking dismissal under Rule 12(b)(6). Valdez Fisheries, in turn did not submit any materials outside the pleadings when opposing Alyeska's motion, and had no duty to do so. Instead, it properly contended that dismissal under 12(b)(6) would be improper because its third-party complaint satisfied Rule 8 by alleging that Valdez Fisheries and Alyeska had entered a contract to lease the Sea Hawk facility and that Alyeska had later repudiated that contract. Valdez Fisheries also properly maintained that it had never alleged that the details contained in its complaint were exhaustive; that it had not yet been given the opportunity to present evidence demonstrating the existence of the contract because Alyeska had not filed a motion for summary judgment; and that conversion of the dismissal motion to one for summary judgment would therefore be premature.

In response to these arguments, the superior court dismissed Valdez Fisheries' contract claim under Rule 12(b)(6) without looking beyond the pleadings, relying on the narrow (and legally incorrect) theory that a complaint must specifically allege all steps of contract formation and that Valdez Fisheries' third-party complaint failed to allege the required information. Even if the superior court had elected to look beyond the complaint and convert Alyeska's Rule 12(b)(6) motion into a motion for summary judgment, moreover, the court would have been obliged to give Valdez Fisheries notice of its intent to do so and a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Alaska R. Civ. P. 12(b)(6). Given these circumstances, it is fundamentally unfair to treat Valdez Fisheries' proposed amended complaint as a proxy for a formal response to a summary judgment motion that Alyeska steadfastly declined to file. The opinion's harmless error theory essentially condones a Rule 12(b)(6) dismissal by going beyond the pleadings without giving Valdez Fisheries fair notice or a reasonable opportunity to present all pertinent materials.